**LEWIS BRISBOIS BISGAARD & SMITH LLP**
DEBORAH F. SIRIAS, SB# 102893
   E-Mail: sirias@lbbslaw.com
THOMAS S. KIDDE, SB# 61717
   E-Mail: kidde@lbbslaw.com
221 North Figueroa Street, Suite 1200
Los Angeles, California  90012
Telephone: 213.250.1800
Facsimile: 213.250.7900

**FREDRIKSON & BYRON, P.A.**
Paul E. Thomas (SB# 208577)
   E-Mail: pthomas@fredlaw.com
Lora M. Friedemann (MN# 259615)
   E-Mail: lfriedemann@fredlaw.com
Chelsea L. Sommers (MN# 0393414)
   E-Mail: csommers@fredlaw.com
200 South Sixth Street, Ste. 4000
Minneapolis, MN 55042
(612) 492-7000/Fax: (612) 492-7077

*Attorneys for Plaintiff*
Chroma Makeup Studio LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| CHROMA MAKEUP STUDIO LLC, | CASE NO. CV12-09893 ABC-(PJWx) |
| Plaintiff, | |
| v. | **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CHROMA'S MOTION FOR PRELIMINARY INJUNCTION** |
| BOLDFACE GROUP, INC. and BOLDFACE LICENSING + BRANDING, | |
| Defendants. | Trial Date:        None Set |
| | Hearing Date:    January 7, 2013 |
| | Time:              10:00 a.m. |
| | Courtroom:       680 |

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

**TABLE OF CONTENTS**

2
Page

3

INTRODUCTION .................................................................................................... 1

FACTS ................................................................................................................ 1

ARGUMENT ........................................................................................................... 5

I.     Chroma's Claims and Applicable Law ........................................................ 6

II.    Chroma Is Likely to Prevail on the Merits. ............................................... 8

     A.     The CHROMA Marks Are Inherently Distinctive. ............................... 8

        1.     The CHROMA Marks Are Conceptually Strong ......................... 8

        2.     The CHROMA Marks Have Acquired Commercial Strength. ........................................................ 10

        3.     The KHROMA Marks Have Great Commercial Strength ......... 10

     B.     The Goods Are Closely Related. ........................................................... 12

     C.     The Marks Are Similar. ........................................................................ 12

     D.     Customers and Potential Customers Are Being Confused .................. 16

     E.     Chroma's Plans for Expansion Have Been Derailed. .......................... 17

III.   Chroma Is Being Irreparably Harmed. ..................................................... 17

     A.     Irreparable Harm Is Presumed. ............................................................ 17

     B.     Chroma Has Demonstrated Irreparable Harm. .................................... 18

IV.   The Balance of Hardships and the Public Interest Favor Chroma. ............... 19

CONCLUSION ...................................................................................................... 20

1

## TABLE OF AUTHORITIES

2

CASES

3

*Academy of Motion Picture Arts & Sciences v. Creative House Promotions,*
  944 F.2d 1446 (9th Cir. 1991) ..............................................................6

*A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.,*
  237 F.3d 198 (3d Cir. 2000)................................................................ 10

*AMF Inc. v. Sleekcraft Boats,*
  599 F.2d 341 (9th Cir. 1979) ........................................................ 7, 13

*Amoco Prod. Co. v. Village of Gambell,*
  480 U.S. 531 (1987)........................................................................... 19

*Brookfield Comms., Inc. v. West Coast Entm't Corp.,*
  174 F.3d 1036 (9th Cir. 1999) ....................................................... 6, 17

*Cadence Design Sys., Inc. v. Avant! Corp.,*
  125 F. 3d 824 (9th Cir. 1997) ........................................................... 19

*Century 21 Real Estate Corp. v. Sandlin,*
  846 F.2d 1175 (9th Cir. 1988) .......................................................... 15

*Christian Stark v. Diageo Chateau & Estate Wines Co.,*
  2012 U.S. Dist. LEXIS 157794 (N.D. Cal. 2012) ............................. 13

*Cohn v. Petsmart,*
  281 F.3d.............................................................................................. 11

*Conversive, Inc. v. Conversagent, Inc.,*
  433 F. Supp. 2d 1079 (C.D. Cal. 2006) ............................................. 16

*Creager v. Russ Togs, Inc.,*
  218 USPQ 582 (C.D. Cal. 1982)........................................................ 14

*Derringer v. Plate,*
  29 Cal. 292 (1865) ...............................................................................6

*Dreamwerks Prod. Group, Inc. v. SKG Studio,*
  142 F.3d 1127 (9th Cir. 1988) ............................................... 7, 15, 19

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*E. & J. Gallo Winery v. Gallo,*
   967 F.2d 1280 (9th Cir. 1992)............................................................. 13

*Enrique Bernat F., S.A. v. Guadalajara, Inc.,*
   210 F.3d 439 (5th Cir. 2000) ..................................................................9

*Glow Indus. v. Lopez,*
   252 F.Supp.2d 962 (C.D. Cal. 2002) ............................. 7, 8, 9, 10, 11, 12, 15, 16

*GoTo.com, Inc. v. Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000) ..................................................... 13, 15

*Icon Enters. Int'l v. Am. Prods. Co.,*
   2004 U.S. Dist. LEXIS 31080 (C.D. Cal. 2004) ............................... 16

*Interplay Entertainment Corp. v. Topware Interactive, Inc.,*
   751 F. Supp. 2d 1132 (C.D. Cal. 2010) .............................................. 17

*Jada Toys, Inc. v. Mattel, Inc.,*
   518 F.3d 628 (9th Cir. 2008) ...................................................................6

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.,*
   287 F.3d 866 (9th Cir. 2002) ...................................................................8

*JL Bev. Co., LLC v. Beam, Inc.,*
   2012 U.S. Dist. LEXIS 137076 (D. Nev. Sept. 25, 2012)................... 7, 8

*Kendall-Jackson Winery, Ltd. v. E.& J. Gallo Winery,*
   150 F.3d 1042 (9th Cir. 1998) .................................................................6

*M2 Software, Inc. v. Madacy Entertainment,*
   421 F.3d 1073 (9th Cir. 2005) .............................................................. 12

*Masters Software, Inc. v. Discovery Comms., Inc.,*
   725 F. Supp. 2d 1294 (W.D. Wa. 2010) ........................................... 7, 17

*Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.,*
   856 F.2d 1445 (9th Cir. 1988) .............................................................. 10

*Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.,*
   175 F.3d 266 (2d Cir. 1999)...................................................................9

*Rearden LLC v. Rearden Commerce, Inc.,*
   683 F.3d 1190 (9th Cir. 2012) ............................................ 7, 12, 14, 16

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

*S3 Inc. v. Cirrus Logic, Inc.,*
1995 U.S. Dist. LEXIS 34716 (9th Cir. Nov. 27, 1995) .................................... 15

*Seed Serv., Inc. v. Winsor Grain, Inc.,*
2012 U.S. Dist. LEXIS 51779 (E.D. Cal. 2012)................................................. 19

*Stuhlbarg Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.,*
240 F.3d 832 (9th Cir. 2001) ............................................................................. 18

*Thane Intern Inc. v. Trek Bicycle Corp.,*
305 F.3d 894 (9th Cir. 2002) ............................................................................. 16

*Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.,*
609 F.3d 975 (9th Cir. 2010) ...............................................................................5

*Ugg Holdings, Inc. v. Severn,*
2005 U.S. Dist. LEXIS 45783 (C.D. Cal. 2005) ..................................................9

*Walter v. Mattel, Inc.,*
210 F.3d 1108 (9th Cir. 2000) ..............................................................................7

*Winter v. Natural Res. Def. Council, Inc.,*
129 S.Ct. 365 (2008)..................................................................................... 5, 19

**STATUTES**

California Business & Professions Code § 17200, *et seq.*........................................6

Lanham Act, 15 U.S.C. § 1125 .................................................................................6

**OTHER AUTHORITIES**

*Compact Edition of the Oxford English Dictionary,*
Oxford University Press, 1971, I:409 ...................................................................9

*McCarthy on Trademarks and Unfair Competition,*
§ 11:34 (4th ed. 2002)............................................................. 6, 9, 11, 14, 15, 16

*Webster's New Collegiate Dictionary,*
2d ed., Simon & Schuster, 1984, 253 ...................................................................8

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Plaintiff Chroma Makeup Studio LLC ("Chroma") is entitled to a preliminary injunction to stop Boldface from infringing Chroma's trademarks CHROMA, CHROMA COLOUR, CHROMA MAKEUP STUDIO, and CHROMA MAKEUP STUDIO & C Design (hereinafter the "CHROMA Marks") by using the marks KHROMA, KHROMA BEAUTY, and KHROMA BEAUTY KOURTNEY KIM KHLOÉ & Design (hereinafter the "KHROMA Marks").  Chroma is likely to succeed on the merits and will be irreparably harmed without an injunction. Chroma has sold cosmetics under the CHROMA Marks for twelve years. Defendants' recent launch of a mass-marketed cosmetics line under the confusingly similar KHROMA Marks is creating actual consumer confusion.  To prevent Chroma from suffering further irreparable harm, Chroma respectfully requests an injunction.

**FACTS**

Chroma is a California limited liability company located at 9605 South Santa Monica Boulevard in Beverly Hills, one block from Rodeo Drive and within the "Golden Triangle," the most exclusive shopping district in Los Angeles. (Declaration of Michael Rey III, ¶4 (hereinafter, "Rey Dec."); Declaration of Lisa Casino ¶4 (hereinafter, "Cas. Dec.").)  Chroma has continuously used the CHROMA Marks –

  

1

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  with beauty services, cosmetics, and beauty products for the past twelve years. (Rey

2  Dec., ¶4.) Chroma sells cosmetics from its permanent location, from the Chroma

3  Makeup Studio at Butterfly Loft, in Encino, California, and online through its

4  website at www.ChromaMakeupStudio.com. (*Id.*)

5       Esteemed by celebrated Hollywood actors, Beverly Hills executives, and

6  entertainment professionals, Chroma has achieved a prominent place in the beauty

7  industry, especially in Los Angeles. (Rey Dec., ¶7; Cas. Dec., ¶¶6-7.) Among its

8  prominent clientele, Chroma lists Paula Abdul, Kelly Clarkson, Rebecca Gayheart,

9  Mary Kate Olsen, Ashley Olsen, Perrey Reeves, Britney Spears, Rachel Weisz, and

10 several others Chroma cannot disclose due to confidentiality agreements. (Rey

11 Dec., ¶9; Cas. Dec., ¶2.) Chroma is regularly featured in publications like *Los*

12 *Angeles Confidential, Beverly Hill,* and *Moxley Head to Toe Guide to Beauty*

13 *Services in Los Angeles.* (Rey Dec., ¶10 and Ex. 1 thereto.) In 2011, visitors to the

14 "L.A. Hotlist!" website ranked Chroma #1 in the beauty supply category. (*Id.*)

15 Chroma's reputation for excellence has brought national attention in fashion

16 magazines such as *Vogue, Elle, Self, Genlux,* and *Lucky.* (Rey Dec., ¶ 11; Cas. Dec.,

17 ¶¶7-8 and Ex. 1 thereto.) Although Chroma's business is concentrated in Los

18 Angeles, Chroma's clientele extends throughout the United States and overseas.

19 (Cas. Dec., ¶9) Chroma has clients in 42 states and in several foreign countries.

20 (*Id.*)

21      Earlier this year, Defendants Boldface Group, Inc. and Boldface Licensing +

22 Branding (collectively "Boldface") issued a press release indicating that

23 "KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOÉ KARDASHIAN"

24 would be launched in December of 2012 at Ulta stores and that "a comprehensive

25 launch" will occur in January and February of 2013. (Declaration of Amy

26 Sobiesczyk, ¶10 and Ex. 4 thereto (hereinafter, "Sob. Dec.").) The press release

27 emphasizes that the "true star quality" of Kourtney, Kim, and Khloé Kardashian

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 lends an "immediate brand recognition factor" to KHROMA, and it gives it "an
2 advantage over most launching brands." (*Id.*)

3       The Kardashians are prominent television personalities who star in the E!
4 Entertainment Television series *Keeping Up with the Kardashians*. (*Id.*, ¶3-9 and
5 Ex. 1-3 thereto.) The popular series has completed seven seasons, regularly draws
6 more than three million viewers, and, consequently, the Kardashians have become
7 household names. (*See id.*) On August 26, 2012, Boldface and the Kardashians
8 introduced the KHROMA cosmetics line on an episode of *Keeping Up with the*
9 *Kardashians*. (*Id.*, ¶15.) Boldface also drew considerable media attention to the
10 impending product launch. (*Id.*, ¶ 12-16. and Exs. 5 and 6 thereto.)

11      On approximately November 8, 2012, Boldface shipped KHROMA products
12 _

13

14

15

16       

17

18

19

20 to approximately 4,500 retail stores throughout the United States, including the Ulta
21 and Sears chains. (*Id.*, ¶17-19 and Exs. 7-9 thereto.) The products also became
22 available on Amazon.com. (*Id.* ¶23 and Ex. 12 thereto.).
23      Since the launch and increasingly in the last three weeks, Chroma has
24 experienced many instances of actual consumer confusion. (Rey Dec., ¶¶12-13 and
25 Ex. 1 thereto; Cas. Dec., ¶11; Declaration of Cameron Cohen, ¶4 (hereinafter "Cohn
26 Dec."). ) Notable examples include the following. Two consumers confused about
27 the source of goods contacted Chroma via telephone to inquire whether Chroma
28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   carries KHROMA faux eyelashes. (Rey Dec., ¶13 and Ex. 1 thereto, Nos. 51 and

2   52; Declaration of Jennifer Galperson, ¶¶2, 4 (hereinafter "Gal. Dec.").) Another

3   customer posted a message on Chroma's Facebook page in which she said she saw

4   the KHROMA brand on *Keeping Up with the Kardashians* and thought it indicated

5   an affiliation between Chroma and the Kardashians: "I saw the episode where they

6   were talking about their makeup line and I thought "Wow, Lisa is in business with

7   them"?" (*Id.*, No.17.)

8       Several Chroma customers have expressed concerns about mistaken

9   perceptions among persons unfamiliar with Chroma. (Rey Dec., ¶14; Cas. Dec. ¶12;

10   Cohen Dec., ¶3.) One customer said she was worried about "someone thinking

11   she's wearing the Kardashians' line, not Chroma, when she shares what makeup

12   she's wearing," and that this would put her in a position to have to "defend her

13   choice for fear of association." (Rey Dec., ¶13 and Ex. 1 thereto, No. 29; Cas. Dec.,

14   ¶12.) And, many current and potential customers have expressed the opinion that

15   the KHROMA brand will create public confusion with the long-standing CHROMA

16   brand, including Dita Soedarjo, who is a friend of the Kardashians. (Rey Dec., ¶14.)

17   On October 18, 2012, Soedarjo told Michael Rey that she had shown some Chroma

18   products to Kim Kardashian, and asked "Why would you name your line after a

19   makeup studio with a makeup line that I go to in Beverly Hills?" Kardashian's

20   response was "We liked the name, and if it becomes a problem, someone else will

21   have to deal with it." (Rey Dec., ¶13 and Ex. 1 thereto, No.5.)

22       Chroma has also experienced a loss of business expansion opportunities since

23   Boldface's announcement of the KHROMA launch. (Rey Dec., ¶¶16-17; Cas. Dec.

24   ¶13; Cohen Dec., ¶3.) This has taken immediate form in loss of referral business.

25   (Cas. Dec., ¶13 and Ex. 2 thereto.) A prominent branding consultant in the beauty

26   industry told Chroma in a letter dated November 27, 2012 that her firm would not

27   make holiday referrals because of the KHROMA launch:

28       It is usually this time of year that we write to our private clients in the

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

States and also here in London to remind them, or introduce them, to Chroma for their holiday shopping needs. . . . I'm really very sorry to tell you that we won't be doing that this year. I'm afraid there is so much controversy concerning the other Khroma line of makeup that the Kardashians are promoting, that we can't risk the confusion. As you well know, our clients are very discreet, very fussy, and would never want to be associated with anything like the Kardashian image -- even through a misunderstanding.

(*Id.*)

In addition, brand development and licensing opportunities have stalled. (Rey Dec., ¶¶16-17; Cas. Dec., ¶¶14-15.) Chroma's branding and public relations firm advised Chroma that its brand expansion activities have been effectively extinguished unless Chroma can resolve this situation with Boldface in a manner that will allow Chroma both to expand and also to provide reassurance to potential licensees and retail partners that KHROMA will not completely overtake the market for products branded with the CHROMA Marks. (Declaration of Joni Rae, ¶¶7-8 (hereinafter "Rae Dec.").)

In an effort to prevent further confusion, Chroma posted a letter on its website explaining that it is not associated with the Kardashians. (Rey Dec., 18.) Chroma also sent a letter to Boldface demanding that Boldface either change the KHROMA brand or contact Chroma to discuss other options. (*Id.*, 19 and Ex. 3 thereto.) Boldface's response was unsatisfactory, leading to this motion. (*Id.*)

## ARGUMENT

To be entitled to injunctive relief, Chroma must establish: (1) that it is likely to succeed on the merits, (2) that it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in its favor, and (4) that the injunction is in the public interest. *Toyo Tire Holdings of Ams. Inc. v. Cont'l Tire N. Am., Inc.*, 609 F.3d 975, 982 (9th Cir. 2010) (citing *Winter v. Natural Res. Def. Council, Inc.*, 129 S.Ct. 365, 374 (2008)).

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

5

1  Because Chroma meets all four factors, the Court should enjoin Boldface.

2  **I.   Chroma's Claims and Applicable Law.**

3  Chroma brings two claims against Boldface: trademark infringement under
4  the Lanham Act, 15 U.S.C. § 1125, and unfair competition under the California
5  Business & Professions Code § 17200, *et seq*.  The same analysis applies to both
6  claims. *Academy of Motion Picture Arts & Sciences v. Creative House Promotions*,
7  944 F.2d 1446, 1457 (9th Cir. 1991).  To succeed, Chroma must show, first, that it
8  owns a valid mark, and, second, that the KHROMA Marks create a likelihood of
9  confusion. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008).

10  Chroma meets the valid mark ownership element.  As demonstrated in
11  Chroma's argument in section II.A. below, the CHROMA Marks are inherently
12  distinctive as arbitrary or suggestive marks.  Plus, the CHROMA Marks have
13  acquired distinctiveness through twelve years of continuous use in commerce.

14  Federal registration is not a prerequisite for trademark ownership:  "It is not
15  registration, but only actual use of a designation as a mark that creates rights and
16  priority over others." *McCarthy on Trademarks and Unfair Competition*, §16:1.
17  Federal registration is also not a prerequisite for federal protection and enforcement
18  under the Lanham Act. *Kendall-Jackson Winery, Ltd. v. E.& J. Gallo Winery*, 150
19  F.3d 1042, 1047 n.7 (9th Cir. 1998).[1]  Because "it is axiomatic in trademark law that
20  the standard test of ownership is priority of use," Chroma, as the senior user, has the
21  right to enjoin Boldface from using a confusingly similar mark in the same market
22  and within Chroma's natural zone of expansion. *Brookfield Comms., Inc. v. West*

23

24

25  [1] Common law trademark rights have been recognized under California law for over
    a century. *Derringer v. Plate*, 29 Cal. 292, 293 (1865)  ("The principle is well
26  settled that a manufacturer may by priority of appropriation of names, letters, marks,
27  or symbols, acquire a property therein as a trade mark.").

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1 | *Coast Entm't Corp.,* 174 F.3d 1036, 1046 (9th Cir. 1999).

2 | To determine whether Chroma fulfills the likelihood of confusion element,

3 | the Court may consider eight factors (the "*Sleekcraft*" factors): (1) strength of the

4 | mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual

5 | confusion; (5) marketing channels used; (6) type of goods and the degree of care

6 | likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark;

7 | and (8) likelihood of expansion of the product lines. *Rearden LLC v. Rearden*

8 | *Commerce, Inc.*, 683 F.3d 1190, 1209 (9th Cir. 2012) (citing *AMF Inc. v. Sleekcraft*

9 | *Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

10 | This is a case of reverse confusion. Reverse confusion occurs when a large

11 | market participant begins using a mark confusingly similar to a mark already in use

12 | by a small market participant, and  purchasers are likely to mistakenly believe that

13 | the senior user's products are somehow affiliated with the junior user because "the

14 | junior user saturates the market with a similar trademark and overwhelms the senior

15 | user." *JL Bev. Co., LLC v. Beam, Inc.*, 2012 U.S. Dist. LEXIS 137076 at *12 (D.

16 | Nev. Sept. 25, 2012); *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127,

17 | 1130 (9th Cir. 1988); *Masters Software, Inc. v. Discovery Comms., Inc.*, 725 F.

18 | Supp. 2d 1294, 1299 (W.D. Wa. 2010).  Claims for reverse confusion "protect the

19 | small senior user from losing control over its identity in the 'rising tide of publicity

20 | associated with the junior mark.'" *Walter v. Mattel, Inc.*, 210 F.3d 1108, 1110 (9th

21 | Cir. 2000).

22 | In reverse confusion cases, the first three *Sleekcraft* factors are especially

23 | pertinent. *Glow Indus. v. Lopez*, 252 F.Supp.2d 962, 986 (C.D. Cal. 2002).  Chroma

24 | addresses these as well as additional salient factors that support a preliminary

25 | injunction.

26

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

II.     **Chroma Is Likely to Prevail on the Merits.**

   A.     The CHROMA Marks Are Inherently Distinctive.

   In reverse confusion circumstances, courts "evaluate the conceptual strength of the senior user's mark and compare it to the commercial strength of the junior user's mark." *JL Bev. Co., LLC v. Beam, Inc.*, 2012 U.S. Dist. LEXIS 137076 at * 13 (D. Nev. Sept. 25, 2012); *Glow Indus.*, 252 F. Supp. at 987.  The conceptual strength of a trademark is measured on a weak-to-strong categorical spectrum which moves from "generic" terms, which cannot function as marks, to "descriptive" terms, which can function as marks if they acquire secondary meaning and distinctiveness through use, to three categories of inherently distinctive: "suggestive" marks, which require imagination to link the mark with the goods; "arbitrary" marks, known words which bear an arbitrary connection to the goods; and "fanciful" marks, coined terms having no meaning in a known language. *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 872 (9th Cir. 2002); *Rearden*, 683 F.3d at 1211.

   1.     The CHROMA Marks Are Conceptually Strong.

   "CHROMA," the dominant term in the CHROMA Marks,[2] is inherently distinctive because it is either arbitrary or suggestive.  The term "chroma" is the Latin form of the Classical Greek χρώμα, meaning "color."  In English, "chroma" refers to the purity of color saturation, but is not widely known in the United States and is listed in *Webster's* as having chiefly British usage. *Webster's New Collegiate Dictionary*, 2d ed., Simon & Schuster, 1984, 253.  "Chroma" more commonly functions as a Classical Greek root for English words coined in the 19th century,

---

[2] Chroma acknowledges that "Makeup Studio" in the CHROMA MAKEUP STUDIO mark may be merely descriptive of Chroma's makeup services.

8

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1 like "chromatic," and "chromatology." *Compact Edition of the Oxford English*
2 *Dictionary*, Oxford University Press, 1971, I:409.  Consequently, "chroma" by itself
3 is not in wide use as a generic term in the United States.

4     Nor is CHROMA descriptive when used as a mark.  As a Classical Greek
5 term, CHROMA is not subject to the doctrine of foreign equivalents, which
6 "requires that foreign words first be translated into English and then tested for
7 descriptiveness or genericness." *Ugg Holdings, Inc. v. Severn*, 2005 U.S. Dist.
8 LEXIS 45783 *18 (C.D. Cal. 2005) (citing *Enrique Bernat F., S.A. v. Guadalajara,*
9 *Inc.*, 210 F.3d 439, 443 (5th Cir. 2000)).  CHROMA is exempt from this analysis
10 because the doctrine applies only to living languages and rests on the following
11 assumption: "[T]here are (or someday will be) customers in the United States who
12 speak that foreign language" and so "[n]o merchant may obtain the exclusive right
13 over a trademark designation if that exclusivity would prevent competitors from
14 designating a product as what is in the foreign language their customers know best."
15 *Id.*, quoting *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 271
16 (2d Cir. 1999), and citing *Enrique Bernat*, 210 F.3d at 443; *see also McCarthy on*
17 *Trademarks and Unfair Competition*, § 11:34 (4th ed. 2002) ( "foreign words from
18 dead languages such as Classical Greek . . . might be so unfamiliar . . . that they
19 should not be translated").

20     The CHROMA marks are either arbitrary or suggestive.  Because the
21 CHROMA Marks are inherently distinctive, the conceptual strength of the
22 CHROMA Marks weighs in favor of a finding of a likelihood of confusion: "we
23 believe that, just as in direct confusion cases, a strong mark should weigh in favor of
24 a senior user" because "those courts that have clearly distinguished conceptual from
25 commercial strength in the reverse confusion context have weighed a conceptually
26 strong mark in the senior user's favor, in the same manner as they would in direct
27 confusion cases." *Glow Indus.*, 252 F.Supp.2d at 987, quoting *A&H Sportswear*,

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

9

1    *Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000).

2            2.     The CHROMA Marks Have Acquired Commercial Strength.

3        Placing the CHROMA Marks on the spectrum of distinctiveness is only the

4 first step in the strength inquiry: "The second step is to determine the strength of the

5 mark in the marketplace" which is "its degree of recognition in the minds of the

6 relevant customer class." *Glow Indus.*, 252 F.Supp.2d at 987, quoting *Miss World*

7 *(UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988).

8        Aside from its website, Chroma does not advertise in media. Instead, Chroma

9 relies on word-of-mouth advertising. (Rey Dec., ¶8; Rae Dec., ¶3; Cohn Dec. ¶3.)

10 This method has worked, and Chroma has a high degree of recognition among

11 beauty product and services consumers in Los Angeles. Customers have submitted

12 enthusiastic reviews to Yelp.com and have given Chroma's employees high ratings

13 for their expertise. (Rey Dec., ¶10 and Ex 1 thereto.)

14        In its twelve years of operations, Chroma has generated more than $5.6

15 million dollars in income from sales of products and services. (Cas. Dec., ¶9.)

16 Chroma's services output steadily increased during its first eight years and has

17 remained strong during the last four. (*Id.*) Chroma's out-of-state sales increased in

18 the last four years, which testifies to the growing commercial strength of the

19 CHROMA brand. (*Id.*) In the last two years alone, Chroma has shipped products to

20 forty-two of the United States. (*Id.*) Simply put, the CHROMA Marks have

21 commercial strength in the United States, and the heart of that strength lies in

22 California.

23            3.     The KHROMA Marks Have Great Commercial Strength.

24

25        In reverse confusion circumstances, a court should analyze "(1) the

26 commercial strength of the junior user as compared to the senior user, and (2) any

27 advertising or marketing campaign by the junior user that has resulted in a saturation

28 of the public awareness of the junior user's mark." *Glow Indus.*, 252 F.Supp.2d at

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   988.   In short, "a court should evaluate the strength of the junior user's mark so as

2   to gauge its ability to overpower the senior user's mark." *Id*., quoting *McCarthy on*

3   *Trademarks and Unfair Competition*, § 23:10.

4          Boldface's has widely promoted the KHROMA line.   In addition to the pre-

5   launch publicity that KHROMA received on *Keeping Up with the Kardashians*, a

6   program that reaches more than three million viewers per week, Boldface's publicity

7   has included coverage on major news programming such as CNBC, and in key

8   beauty publications such as *InStyle Magazine* and *WWD*.   (Sob. Dec., ¶14 and Ex. 6

9   thereto.)   Plus, all three of the Kardashians have promoted the KHROMA brand on

10  their individual websites.   (*Id*., ¶12.)   Powered by the fame and resources of the

11  Kardashians, Boldface's initial KHROMA launch in November went to 4,500 Sears

12  and Ulta stores nationwide, to the websites for those stores, and to Amazon.com.

13  (*Id*., ¶¶17-19 and Ex. 7-9 thereto.)

14         This publicity evidences a commercial strength far beyond that possessed by

15  Chroma.   The disparate abilities of Chroma and Boldface to attract public attention

16  shows clearly on their Facebook pages.   Chroma's page, though up for several years,

17  has, to date, prompted less than 250 consumer "likes" and less than 40 comments.

18  (*Id*., ¶13 and Ex. 5 thereto.)   The KHROMA page, though up for only a month, has

19  prompted more than 52,000 consumer "likes" nearly 6,000 comments.   (*Id*.)   After

20  mere weeks of sales, it is clear that Boldface's KHROMA line is attracting

21  considerable consumer attention.

22         The market saturation by the KHROMA brand even in its first weeks of sales

23  creates reverse confusion.   Based on the disparity of commercial strength between

24  Chroma and Boldface due to Boldface's ability to capitalize on its connection with

25  the Kardashians, the court can find that Boldface's product line is likely to

26  overwhelm Chroma in the market.   *Glow Indus*., 252 F.Supp.2d  at 990, and see

27  *Cohn v. Petsmart*, 281 F.3d at 841 ("Petsmart's extensive advertising gives it the

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

11

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   ability to overwhelm any public recognition and goodwill that Cohn has developed

2   in the mark."); *see also* Cohn Dec., ¶2; Gal. Dec., ¶3.) Further, because, unlike the

3   plaintiff's conceptually weak GLOW mark in the *Glow Industries* case, the

4   CHROMA Marks are conceptually strong and also have commercial strength, this

5   *Sleekcraft* factor favors a finding of a likelihood of confusion.

6        B.    The Goods Are Closely Related.

7        The goods identified by the CHROMA Marks and the KHROMA Marks are

8   closely related. Related goods are those "which would be reasonably thought by the

9   buying public to come from the same source if sold under the same mark." *Rearden*

10  *LLC*, 683 F.3d at 1212-13. Goods are related if they are "similar in use and

11  function." *M2 Software, Inc. v. Madacy Entertainment*, 421 F.3d 1073, 1082 (9th

12  Cir. 2005).

13       In the instant case, both parties sell cosmetics. They are direct competitors,

14  especially in California. Some of the goods, such as mascara, lip sets, and eye

15  shadow, are identical. (Sob. Dec., ¶ 26.) Although the products sell at slightly

16  different price points, *id.*, the price points are not so widely different that that the

17  products are non-competitive. *Glow Indus.*, 252 F. Supp. 2d at 992 ("The products

18  are also sold at comparable prices, and are thus accessible to comparable groups of

19  consumers.") Cosmetics selling at different price points are commonly sold in the

20  same national retail chains, and the same customer may buy some high end

21  cosmetics and some lower end cosmetics. (Cas. Dec., ¶6; Sob. Dec., ¶19. and Ex. 9

22  thereto) In addition, purchasers are accustomed to seeing high end brands and

23  lower-cost brands offered by the same company. (Rae Dec., ¶6.)

24       This *Sleekcraft* factor supports a finding of a likelihood of confusion.

25

26       C.    The Marks Are Similar.

27       When comparing marks for the purpose of determining likelihood of

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1   confusion, the proper test is not whether consumers would be confused in a side-by-

2   side comparison of the products, but whether confusion is likely when a consumer,

3   familiar with the one party's mark, is presented with the other party's goods alone.

4   *Christian Stark v. Diageo Chateau & Estate Wines Co.*, 2012 U.S. Dist. LEXIS

5   157794 *26-7 (N.D. Cal. 2012).  The Ninth Circuit has developed "certain detailed

6   axioms to guide this comparison" of marks for similarity: (i) the marks must be

7   considered in their entirety and as they appear in the marketplace; (ii) the marks

8   should be analyzed by their sound, sight, and meaning; and (iii) similarities are

9   weighed more heavily than differences. *Id.*, at *23, citing *GoTo.com, Inc. v. Walt*

10   *Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).

11       On the basis of meaning, CHROMA and KHROMA both come from the

12   Classical Greek χρώμα, meaning "color," despite the altered spelling in Boldface's

13   mark.  Therefore, their meanings as trademarks are identical.

14       The pronunciation of CHROMA and KHROMA is also identical.  Sound is

15   especially important in this case because Chroma grows its business by word-of-

16   mouth.  *AMF*, 599 F.2d at 351 (recognizing that "sound is important because

17   reputation is often conveyed word-of-mouth").[3]  In addition, customers refer to the

18   products by the dominant terms "CHROMA" and "KHROMA" when discussing or

19   requesting the products.  Because marks are considered as they appear in the

20   marketplace and the products are called CHROMA and KHROMA in the

21   marketplace, the court's inquiry should focus on these dominant terms.  *E. & J.*

22   *Gallo Winery v. Gallo*, 967 F.2d 1280, 1292 (9th Cir. 1992) (that the public uses the

23   dominant term GALLO to refer to the defendant's products "supports the conclusion

24   that the marks are similar").  This assertion is further supported by Boldface's own

25   _____

26   [3] Confusion will occur when a purchaser of either parties' product is asked "What

27   kind of lipstick are you wearing?"  The answer could refer to either brand.

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1   practice: Boldface representatives have repeatedly referred to its mark merely as

2   "KHROMA" in recorded public appearances in television media. (Sob. Dec., ¶21-

3   25 and Exs. 10-13 thereto.)   *Rearden LLC,* 683 F.3d at 1212 (noting that defendant

4   referred to itself as "Rearden," not "Rearden Commerce" in evaluating the similarity

5   of the marks).

6         The marks are also similar in sight.  Aside from the terms CHROMA and

7   KHROMA, none of the word elements in the marks is inherently distinctive.  The

8   term MAKEUP STUDIO in the CHROMA Marks is descriptive of Chroma's

9   services.  The term BEAUTY in the KHROMA Marks is not only descriptive of

10  Boldface's cosmetics, but is also a generic term referring to the entire beauty

11  industry.  The name components of the KHROMA Marks, KOURTNEY, KIM, and

12  KHLOÉ, are descriptive: "Under the traditional rule, personal names are regarded as

13  in the same category as descriptive terms . . . [and] they can be protected as

14  trademarks only upon proof that, through usage, they have acquired distinctiveness."

15  *McCarthy on Trademarks and Unfair Competition,* § 13:2; *Creager v. Russ Togs,*

16  *Inc.,* 218 USPQ 582, 585 (C.D. Cal. 1982) (Plaintiff required to prove that first

17  name Victoria had acquired secondary meaning as trademark but no secondary

18  meaning found.)[4]  The name component of the KHROMA Marks has been in use for

19  only a few weeks, an insufficient period of time to acquire distinctiveness.  This

20  leaves the dominant elements, CHROMA and KHROMA.

21  _____

22  [4] Boldface may argue that the use of the KOURTNEY, KIM, and KHLOÉ names
23  with the KHROMA Marks will alleviate any confusion.  Although a house mark
    often lessens the risk of confusion in a forward confusion case, the use of a house
24  mark increases the likelihood of confusion in a reverse confusion case. *See Glow*
25  *Indus.* 252 F. Supp. 2d at 995 ("Given the reverse confusion context, however, the
    court cannot conclude in the absence of survey or other evidence of consumer
26  reaction to the products . . . that the addition of the "J.Lo" housemark mitigates the
27  likelihood of consumer confusion.")

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1       "In most composite marks, some part of the mark is 'dominant' in its total

2 impact upon the ordinary buyer, over and above the 'peripheral' elements of the

3 mark." *McCarthy on Trademarks and Unfair Competition*, § 23:44.  When

4 analyzing the similarity of the marks, the dominant term may be given more weight.

5 *See S3 Inc. v. Cirrus Logic, Inc.,* 1995 U.S. Dist. LEXIS 34716 at *5 (9th Cir. Nov.

6 27, 1995) (unreported); *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175,

7 1179 (9th Cir. 1988) (likelihood of confusion existed where the "identical dominant

8 term" CENTURY was the "lead word in each entity's name").

9       The dominant elements CHROMA and KHROMA are similar in sight

10 because they differ by only one letter.   A difference of one letter does not

11 sufficiently distinguish CHROMA and KHROMA: "To the eye, the words are

12 similar." *AMF*, 599 F.2d at 351.   In other words, CHROMA and KHROMA are

13 more similar to sight than they are different, and, in the Ninth Circuit's similarity

14 analysis, more weight is given to similarities than to differences.  *GoTo.com,* 202

15 F.3d at 1206.  Even the one letter difference creates confusion because the

16 Kardashians have a history of spelling "C" words with a "K" in their brands.[5]  *See*

17 *Dreamwerks*, 142 F.3d at 1131 (purchasers might "shrug off the [spelling]

18 difference as an intentional modification identifying an ancillary division of the

19 same company").

20       For these reasons, the court can find that the KHROMA Marks are

21 confusingly similar to the CHROMA Marks on the basis of sight: "If the

22 'dominant' portion of both marks is the same, then confusion may be likely,

23 notwithstanding peripheral differences." *McCarthy on Trademarks and Unfair*

24 *Competition*, § 23:44.

25 _____

26 [5] E.g., "KARDASHIAN KHAOS," "KARDASHIAN KURVE," and

27 "KARDASHIAN KOLLECTION."  (Sob. Dec., ¶21.)

28

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1     This and the other two *Sleekcraft* factors most pertinent in reverse confusion

2 circumstances favor a finding of a likelihood of confusion. *Glow Indus.*, 252 F.

3 Supp. 2d at 986.  The existence of actual confusion and the impairment of Chroma's

4 expansion plans provide additional and immediate support in favor of an injunction.

5     D.    <u>Customers and Potential Customers Are Being Confused</u>.

6     Evidence of actual confusion is compelling proof of the fact of likelihood of

7 confusion: "Evidence of actual confusion constitutes persuasive proof that future

8 confusion is likely."  *Conversive, Inc. v. Conversagent, Inc.*, 433 F. Supp. 2d 1079,

9 1092 (C.D. Cal. 2006), citing *Thane Intern Inc. v. Trek Bicycle Corp.*, 305 F.3d 894,

10 902 (9th Cir. 2002).

11     Likelihood of confusion embraces a range of uncertain states of mind that

12 could be categorized as confusion, mistake, or deception, and is not limited to point-

13 of-purchase confusion by actual customers. *Icon Enters. Int'l v. Am. Prods. Co.*,

14 2004 U.S. Dist. LEXIS 31080 *49 (C.D. Cal. 2004) ("The likelihood of confusion

15 inquiry is not limited to actual or potential purchasers, but also includes others

16 whose confusion threatens the trademark owner's commercial interest in the

17 mark."); *Rearden*, 683 F.3d at 1215 (permissible to gauge whether "nonpurchasing

18 members of the public" were confused); *McCarthy on Trademarks*, § 23:5.

19     More than fifty instances of confusion have been logged by Chroma.  The

20 confusion has taken at least four forms: {1} at least nine consumers have been

21 confused in regard to the source of goods: (Rey Dec., ¶13 and Ex. 1 thereto, Nos.

22 23, 34, 35, 42, 48, 51, 52, 54, 57); {2} at least three consumers have mistakenly

23 believed that an affiliation exists between Chroma and the Kardashians (*Id.*, Nos. 8,

24 17, 55); {3} at least sixteen current customers expressed concern about the

25 perceptions of non-purchasers who may be confused into believing that the

26 customers are wearing KHROMA rather than CHROMA (*Id.*, Nos. 3, 11, 18, 19,

27 20, 24, 27, 29, 30, 32, 40, 43, 45, 46, 47, 55); and {4} at least twenty-nine customers

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

1  and potential customers have expressed their uncertainty by stating that the

2  circumstances are confusing (*Id.*).  Chroma's actual confusion evidence not only

3  indicates that future confusion is likely, but also supports the granting of a

4  preliminary injunction in the immediate circumstances at hand.

5        E.    Chroma's Plans for Expansion Have Been Derailed.

6        Since its founding, Chroma has developed the CHROMA brand in accordance

7  with an expansion strategy that has as its goal the licensing of CHROMA products

8  in upscale retail store chains that can distribute Chroma's products nationwide.

9  Chroma's brand consultant, Joni Rae, an expert in beauty marketing, believes that

10  the appearance of the KHROMA brand has effectively extinguished Chroma's long-

11  range expansion plans.  (Rey Dec., ¶16; Cas. Dec., ¶9; Rae Dec., ¶4.)  Further, in the

12  short term, Chroma is losing referral business: two London-based marketing experts

13  have declined to endorse Chroma during the instant holiday season due to fear of

14  confusion with the KHROMA brand.  (Cas. Dec., ¶13 and Ex. 3 thereto; Rae Dec.,

15  ¶¶5-9.)  In light of these facts, this *Sleekcraft* factor favors a finding of a likelihood

16  of confusion.

17  **III.**   **Chroma Is Being Irreparably Harmed.**

18

19        A.    Irreparable Harm Is Presumed.

20        When a likelihood of confusion is shown, irreparable harm is presumed.

21  *Brookfield Comms.*, 174 F.3d at 1047.  The presumption exists because a negative

22  reaction to the defendant's product will "undoubtedly cause irreparable harm to the

23  public image" of the senior mark holder.  *Interplay Entertainment Corp. v. Topware*

24  *Interactive, Inc.*, 751 F. Supp. 2d 1132, 1138 (C.D. Cal. 2010) (presuming

25  irreparable harm and enjoining product release); *Masters Software*, 725 F. Supp. 2d

26  at 1307 ("The harm arising from reverse confusion is not likely to be tangible; it is

27  instead the senior user's loss of 'the value of [its] trademark, its product identity,

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

17

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  corporate identity, control over its goodwill and reputation, and ability to move into

2  new markets.'")

3      B.   <u>Chroma Has Demonstrated Irreparable Harm.</u>

4      Even absent the presumption of irreparable harm, Chroma has shown that it is

5  being irreparably harmed.  The potential loss of good will and the loss of the ability

6  to control one's reputation are recognized forms of irreparable harm. *Stuhlbarg*

7  *Intern. Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir.

8  2001).

9      The long shadow cast by the KHROMA brand eliminates Chroma's ability to

10  control its image and the future of the CHROMA brand.  Purchasers and potential

11  purchasers perceive a relationship between the products.  Because the KHROMA

12  brand is well-publicized and backed by the celebrity of the Kardashians, the brand is

13  overwhelming Chroma and good will it has spent twelve years amassing.  Chroma

14  was exploring a national launch and can no longer do so.  Long-standing customers

15  are less-enthused about the brand now that people perceive it as related to the

16  Kardashian sisters' mass-marketed, less-expensive products.  People who come

17  across Chroma in the future will understandably, but erroneously, believe that

18  Chroma is either affiliated with the KHROMA brand, or is infringing the KHROMA

19  Marks.  In short, Chroma has lost control over its image and is losing the good will

20  its owners have worked for twelve years to build.

21      The future of the Chroma brand is in the hands of this Court.  If Boldface

22  continues to sell cosmetics under the KHROMA Marks, Chroma will have no

23  control over its image and will lose good will.  The only way to prevent the

24  KHROMA Marks from overwhelming Chroma and its lesser-known brand is to

25  enjoin the use of the KHROMA Marks and require Boldface to select a mark that is

26  not confusingly similar to an existing cosmetics line.  Unless and until Boldface is

27  required to change the name of the KHROMA brand, Chroma will be irreparably

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

1  and permanently damaged.

2  **IV.    The Balance of Hardships and the Public Interest Favor Chroma.**

3      This court must balance the parties "competing claims of injury and must

4  consider the effect on each party of the granting or withholding of the requested

5  relief." *Winter*, 129 S. Ct. at 376 (quoting *Amoco Prod. Co. v. Village of Gambell*,

6  480 U.S. 531 (1987)). In the context of this analysis, the court is to discount any

7  economic harm an infringing defendant may experience as self-inflicted. *Cadence*

8  *Design Sys., Inc. v. Avant! Corp.*, 125 F. 3d 824, 829 (9th Cir. 1997) (a defendant

9  that chose an infringing mark "cannot complain of the harm that will befall it when

10  properly forced to desist from its infringing activities").

11      The balance of harms favors Chroma. Chroma has spent more than a decade

12  cultivating an image of quality and exclusivity. Boldface is a recent market entrant

13  that either knew or should have known of the CHROMA Marks before it entered the

14  marketplace. Boldface nevertheless selected a trademark that is nearly identical to

15  the prestigious CHROMA brand. Boldface's conduct should not be rewarded.

16  Boldface should not be allowed to crush Chroma simply because it is being carried

17  in a marketing juggernaut fueled by the Kardashians. *Dreamwerks*, 142 F.3d at

18  1132 (reversing summary judgment for DreamWorks in favor of lesser-known

19  Dreamwerks, and noting that the dispute would not have happened if "DreamWorks

20  been more careful").

21      The public interest also favors an immediate injunction. One of the purposes

22  of trademark law is to protect the consuming public from being misled. *Seed Serv.,*

23  *Inc. v. Winsor Grain, Inc.*, 2012 U.S. Dist. LEXIS 51779, at *16 (E.D. Cal. 2012).

24  Presently, purchasers and potential purchasers of the parties' cosmetics are being

25  confused and are mistakenly perceiving a relationship between the parties. A

26  preliminary injunction will end the confusion and protect the public.

27

28

LEWIS
BRISBOIS
BISGAARD
& SMITH LLP
ATTORNEYS AT LAW

## CONCLUSION

For the foregoing reasons, Chroma respectfully requests that the Court grant its application for a preliminary injunction and enjoin Boldface from using the KHROMA Marks with cosmetics.

Dated: November 4, 2012                    LEWIS, BRISBOIS, BISGAARD & SMITH


                                           _____/s/Thomas S. Kidde_____
                                           Deborah Sirias, Esq.
                                           Thomas S. Kiddé


Dated: November 4, 2012                    FREDRIKSON & BYRON, P.A.


                                           _____/s/Paul E. Thomas_____
                                           Paul E. Thomas, Esq.
                                           Lora M. Friedemann, Esq.
                                           Chelsea Sommers, Esq.

                                           *Attorneys for Plaintiff*
                                           Chroma Makeup Studio, LLC

MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION