1

2

3

4

5

6

7

8

9                          UNITED STATES DISTRICT COURT

10                        CENTRAL DISTRICT OF CALIFORNIA

11
   CHROMA MAKEUP STUDIO LLC,        )      CASE NO.: CV 12-9893 ABC (PJWx)
12                                  )
                    Plaintiff,      )
13                                  )      ORDER RE: PLAINTIFF'S MOTION FOR
        v.                          )      A PRELIMINARY INJUNCTION
14                                  )
   BOLDFACE GROUP, INC.; BOLDFACE   )
15 LICENSING + BRANDING,            )
                                    )
16                  Defendants.     )
   _____)

17

18        Pending before the Court is Plaintiff Chroma Makeup Studio LLC's

19 ("Chroma's") motion for a preliminary injunction, filed on December 5,

20 2012.  (Docket No. 19.)  Defendants Boldface Group, Inc. and Boldface

21 Licensing + Branding (together "Boldface") opposed on December 17 and

22 Chroma replied on December 24.  The Court ordered the parties to file

23 supplemental briefs, which they did on January 3 and January 8, 2013.

24 The Court heard oral argument on Monday, January 14, 2013.  For the

25 reasons below, the motion is DENIED.

26

27

28

**BACKGROUND**[1]

This trademark case arises out of a clash between Chroma, a primarily Los Angeles-based business selling cosmetic products and services under various marks using the word CHROMA, and Boldface, a licensing company engaged in the nationwide roll-out of a cosmetics line under marks using the word KHROMA, which is affiliated with the celebrity Kardashian sisters — Kourtney, Kim, and Khloe.[2]  By way of this motion, Chroma seeks to enjoin Boldface's use of the word KHROMA on its cosmetics throughout the United States, believing that the product launch has caused and will cause substantial consumer confusion.

Plaintiff Chroma's backstory is one of small business success. It operates from two locations, one in Beverly Hills and one in Encino.  The Beverly Hills location is one block from Rodeo Drive in Beverly Hills, California, in what has become known as the "Golden Triangle," the most exclusive shopping district in Los Angeles.  (Rey Decl. ¶ 4.)  For twelve years, Chroma has used the marks CHROMA, CHROMA COLOUR, CHROMA MAKEUP STUDIO, and CHROMA MAKEUP STUDIO along

---

[1]The Court has reviewed the parties' objections to evidence and to the extent those objections are inconsistent with the Court's ruling, they are OVERRULED.  The Court GRANTS Boldface's requests for judicial notice.

[2]The Kardashians are famous television personalities.  Kourtney became famous from an appearance on a 2005 reality series called Filthy Rich: Cattle Drive; two years later, all three sisters were featured on a reality series called Keeping Up with the Kardashians, now in its seventh season, with 3.6 million viewers for the seventh season finale and at least two more seasons on the horizon. (Sobiesczyk Decl. ¶ 3.)  That show also spawned three spin-off series. (Id. ¶ 4.)  In 2010, the Kardashians wrote a best-selling book and that year, Kim Kardashian was the highest paid reality television star at $6 million.  (Id.)  In 2012, Khloe Kardashian was a host of the reality competition series The X Factor.  (Id.)

with a "C" design (together called the "Chroma marks"[3]) for its beauty services, as well as cosmetics and beauty products, which it sells from its Beverly Hills location, from the Chroma Makeup Studio at Butterfly Loft in Encino, California, and online through its website www.chromamakeupstudio.com.  (Id. ¶¶ 5—6.)[4]  Chroma has not registered any marks with the United States Patent and Trademark Office ("PTO").

Chroma considers itself a provider of a "premiere line of cosmetics and [] elite makeup services" (Compl. ¶ 20), and has gained prominence in the beauty industry in Los Angeles.  It has celebrity clients; it was ranked #1 in the beauty supply category on the "L.A. Hotlist!" in 2011; and it has been covered in local magazines like Los Angeles Confidential, Beverly Hills, and Moxley Head to Toe Guide to Beauty Services in Los Angeles, as well as in national magazines like Vogue, Elle, Self, Genlux, and Lucky.  (Rey Decl. ¶¶ 9—11; Casino Decl. ¶¶ 6—8, Ex. 1.)  Its cosmetics are considered high-end, with some priced as high as $135.  (Ostoya Decl. ¶ 21, Ex. A.)  Its yearly sales from 2001 to 2012 ranged between $406,484.80 and $552,402.37, 40% of which came from product sales and 60% from sales of services. (Rey Reply Decl. ¶ 14.)[5]  Sales increased between 2001 and 2007,

---

[3]For the first time in its supplemental brief, Boldface argues that Chroma's marks are limited to CHROMA MAKEUP STUDIO and CHROMA COLOUR.  Because this argument was raised for the first time after Chroma's reply brief and Chroma has not had a chance to respond, the Court declines to consider it.  See Graves v. Arpaio, 623 F.3d 1043, 1048 (9th Cir. 2010).

[4]Photographs of Chroma's products are attached as Appendix A.

[5]In its supplemental brief, Chroma's counsel inconsistently represented that Chroma's yearly sales of between $400,000 and $550,000 were for products only, and because the products sell around $20 an item on average, that represents sales of 25,000 to 27,500 products each year.  (Chroma Supp. Br. 10.)  The Court accepts the
                                                              (continued...)

1   decreased in 2008 and 2009, and began growing again from 2010 to the

2   present. (Id.)

3        Chroma's business has been largely confined to California and the

4   Los Angeles area: while it has clients in more than 40 states and in

5   some foreign countries (Rey Decl. ¶ 11; Casino Decl. ¶ 9); 97.5% of

6   its product sales take place in California (Rey Reply Decl. ¶ 14); and

7   71.6% of its clients are in California, 77.8% of whom are located in

8   Los Angeles County (Casino Supp. Decl. ¶¶ 5—7, Exs. 2, 3).  Both

9   founders of Chroma claim to have intended for years to expand the

10  distribution of Chroma products to exclusive department stores and

11  retailers like Sephora and QVC, but they point to only one recent

12  discussion with a potential licensing partner, Gunthy Renker, as

13  specific evidence of efforts at expansion, and any deal with Renker

14  has been put on hold pending this lawsuit. (Rey Decl. ¶ 16; Casino

15  Decl. ¶ 10; see also Rae Decl. ¶ 4.)  Chroma also has not advertised

16  at all, opting instead to rely upon "word-of-mouth" referrals to

17  expand its business. (Rae Decl. ¶ 3.)

18       Defendant Boldface's backstory is very different.  It was founded

19  by two women in April 2012 as a "celebrity cosmetics and beauty

20  licensing company" with a business model to design, develop, and

21  market cosmetics and beauty-related goods. (Ostoya Decl. ¶¶ 3, 6.)[6]

22  Before forming the company, in October 2011 the founders of Boldface

23  were approached by the Kardashians to submit a proposal to jointly

24  _____

25       [5](...continued)
    statements by Chroma's principal in his declaration, not counsel's
26  representations in Chroma's brief.

27       [6]Defendant Boldface Licensing + Branding is a wholly owned
    subsidiary of Defendant Boldface Group, Inc., which is a holding
28  company. (Ostoya Decl. ¶ 2.)

4

develop a beauty and cosmetics line affiliated with the Kardashian sisters. (Id. ¶ 8.)  The founders spent six months researching and developing the products, during which time they came up with the brand name KHROMA BEAUTY, among others. (Id.)  They claim not to have known about Chroma's existence when they came up with the name. (Id.)[7] Boldface then entered an exclusive licensing agreement with the Kardashians to use their names and likenesses in connection with the development, manufacture, promotion, and sale of cosmetics, beauty products, and other related goods that would be marketed in close connection with the Kardashians' names and likenesses. (Id. ¶¶ 9–10.)

Before presenting possible brand names to the Kardashians, Boldface used an attorney to conduct a trademark search related to the term "KHROMA BEAUTY." (Id. ¶ 12.)  The search yielded dozens of uses of the word "chroma" and certain variants in relation to cosmetics and beauty products, including Chroma's use. (Mantell Decl., Ex. A at 56.)  Boldface concluded that the word "chroma" was being used in the public generically, or at least descriptively, to denote "color." (Ostoya Decl. ¶ 13; Mantell Decl. ¶¶ 2–3, Ex. A; Def.'s Request for Judicial Notice ("RJN"), Ex. 1.)  After presenting three possible brand names, Boldface and the Kardashians gravitated toward the mark "KHROMA BEAUTY," although they also discussed using "KARDASHIAN KHROMA." (Ostoya Decl. ¶ 11.)  In June 2012, Boldface filed two

---

[7]Chroma claims that a "friend" of the Kardashians told one of the owners that she asked Kim, "Why would you name your line after the makeup studio with a makeup line that I go to in Beverly Hills?" Kim purportedly replied, "We liked the name, and if it becomes a problem, someone else will have to deal with it." (Rey Decl. ¶ 14.)  Kim Kardashian denies even knowing this person, let alone talking with her. (Kardashian Decl. ¶ 2.)  The Court notes this conflict only because the parties have spent time discussing it.  It has no impact on the resolution of this motion.

1 trademark applications with the PTO for the marks "KHROMA BEAUTY BY

2 KOURTNEY, KIM AND KHLOE" and "KARDASHIAN KHROMA," Serial Nos.

3 85/646521 and 85/642342, covering "personal care products including

4 cosmetics, body and beauty care products" in International Class 3.

5 (Id. ¶ 14.)  Those applications remain pending.[8]

6     On June 6, 2012, Boldface issued a press release announcing the

7 launch of the product line labeled "KHROMA BEAUTY BY KOURTNEY, KIM AND

8 KHLOE KARDASHIAN" and indicating that some products would appear in

9 Ulta stores in December 2012 with a "comprehensive launch" in January

10 or February 2013. (Sobiesczyk Decl., Ex. 4.)[9]  The press release

11 noted that the "Kardashian's immediate brand recognition factor gives

12 Khroma Beauty an advantage over most launching brands as it holds a

13 wide ranging, aspirational appeal." (Id.)  The product launch has

14 received extensive nationwide media coverage (id. ¶ 14, Ex. 6), was

15 featured on an episode of the Kardashians' reality television show

16 Keeping Up with the Kardashians (id. ¶ 15), has been promoted on each

17 of the Kardashian sisters' websites (id. ¶ 12), and has its own

18 Facebook page with 52,000 "likes" (id. ¶ 13).

19     On November 8, 2012, Boldface shipped KHROMA BEAUTY products to

20 approximately 4,500 retail stores throughout the United States and

21

22     [8]Although not mentioned by either party, on September 26, 2012,
23 the PTO issued office actions for both applications initially refusing
   registration because, inter alia, Boldface's marks create likely
24 confusion with a federal registration for "KROMA" on cosmetics, owned
   by a company in Florida called Lee Tillett, Inc.  (Def.'s RJN, Ex. 1
25 at 173; Thomas Decl. ¶ 3.)  Boldface has six months from the date of
   those actions to respond.  Boldface has also filed a declaratory
26 judgment action against Lee Tillett, Inc. that it does not infringe
   the "KROMA" mark.  See Boldface Licensing Branding v. By Lee Tillett,
27 Inc., No. 12-10269 ABC (PJWx) (filed Nov. 30, 2012).

28     [9]Photographs of these products are attached as Appendix B.

KHROMA BEAUTY products can currently be found at Ulta, CVS, Kmart, Sears, Heb, Meijer, Walgreens Puerto Rico, Fred Meyer, and Duane Reade (in February 2013), and by April 2013 the products will be available on Boldface's website devoted to KHROMA BEAUTY products. (Ostoya Decl. ¶¶ 16, 18.)  Boldface is also in discussions with (and has received some orders from) international distributors, including in the European Union, Australia, Canada, and Japan. (Id. ¶ 17.)  The products are priced between $6.49 and $19.99, as compared to Chroma's products priced between $17.50 and $23.50, with one product priced at $135. (Id. ¶ 20; Sobiesczyk Decl. ¶ 26.)[10]  Boldface claims it could have rolled out higher-end (and higher-priced) products, but it chose to create cosmetics for the mass market at accessible prices, which would more likely reach the Kardashians' fan base. (Ostoya Decl. ¶¶ 22—23.)

Based on orders already placed, Boldface expects substantial sales through December 2013, which will be many multiples of Chroma's annual sales. (Id. ¶ 28.)[11]  Because those orders were placed before this lawsuit was filed, Boldface expects to receive 1.3 million units of KHROMA BEAUTY products over the next four to six weeks, and it will incur storage costs if it is enjoined from selling those products pending resolution of this case. (Id. ¶ 26.)  Boldface has also rolled out an extensive advertising campaign through June 2013,

---

[10]Chroma's eye shadow/blush "kit" sells for $135, while Boldface's KHROMA BEAUTY eye shadow/blush "palette" sells for $12.99. (Sobiesczyk Decl. ¶ 26.)

[11]Because Boldface has filed its revenue figures and other financial information under seal, the Court will not set forth the exact figures in this Order, nor are the exact figures necessary to the resolution of this motion.

primarily in print beauty and celebrity magazines. (<u>Id.</u> ¶ 27.)
Boldface claims it would not be able to pay the costs of production or
storage of the KHROMA BEAUTY products — and therefore would be put out
of business — if an injunction were to stop sales. (<u>Id.</u> ¶ 28.)

Chroma claims that, based upon the roll-out of the KHROMA BEAUTY
products, it has experienced more than 50 instances of purported
consumer confusion over its and Boldface's products, including
customers who have expressed fear that others might associate the
Kardashians with their Chroma products. (Rey Decl. ¶¶ 12—13, Ex. 2;
Rey Reply Decl. ¶¶ 7—11, Exs. 1—6.) As a result, Chroma posted a
letter on its website on October 29, 2012 explaining that it was not
associated with the Kardashians or their products. (Sobiesczyk Decl.
¶ 10, Ex. 4.) Chroma and its employees worry that its clients will be
dissuaded from purchasing Chroma products for fear of being associated
with the Kardashians' KHROMA BEAUTY products and therefore its
business will suffer. (Rey Decl. ¶¶ 15, 17; Cohen Decl. ¶¶ 2—4;
Galperson Decl. ¶¶ 2—4.) Indeed, a prominent branding consultant in
the beauty industry declined to refer her clients to Chroma for the
December 2012 holiday season in light of the "controversy" concerning
KHROMA BEAUTY (Casino Decl. ¶ 13, Ex. 2), and Chroma has been advised
that future brand expansion and licensing opportunities have been
compromised (Rae Decl. ¶¶ 7—8).

By way of this lawsuit, Chroma has asserted claims for trademark
infringement under the Lanham Act, 15 U.S.C. § 1125(a)(1), and unfair
competition under California Business and Professions Code section
17200. Chroma has moved for a preliminary injunction on both claims.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that

1  h e is likely to succeed on the merits, that he is likely to suffer
2  irreparable harm in the absence of preliminary relief, that the
3  balance of hardships tips in his favor, and that an injunction is in
4  the public interest." <u>Winter v. Natural Res. Defense Council, Inc.</u>,
5  555 U.S. 7, 20 (2008); <u>Marlyn Nutraceuticals, Inc. v. Mucos Pharma</u>
6  <u>GmbH & Co.</u>, 571 F.3d 873, 877 (9th Cir. 2009).  This recitation of the
7  requirements for a preliminary injunction did not completely erase the
8  Ninth Circuit's "sliding scale" approach, which provided that "the
9  elements of the preliminary injunction test are balanced, so that a
10  stronger showing of one element may offset a weaker showing of
11  another." <u>Vanguard Outdoor, LLC v. City of Los Angeles</u>, 648 F.3d 737,
12  739 (9th Cir. 2011).

13       "In one version of the 'sliding scale,' a preliminary injunction
14  could issue where the likelihood of success is such that serious
15  questions going to the merits were raised and the balance of hardships
16  tips sharply in [plaintiff's] favor." <u>Id.</u> at 740 (internal quotation
17  marks omitted; brackets in original).  This "serious questions" test
18  survived <u>Winter</u>.  <u>Id.</u>  Therefore, "serious questions going to the
19  merits and a hardship balance that tips sharply in the plaintiff's
20  favor can support issuance of an injunction, so long as the plaintiff
21  also shows a likelihood of irreparable injury and that the injunction
22  is in the public interest." <u>Id.</u> (internal quotation marks omitted).

23                              **DISCUSSION**
24       **A.   Likelihood of Success on the Merits**
25       The Lanham Act proscribes activities that are likely to cause
26  confusion, mistake, or deception as to the association, sponsorship,
27
28

1  or approval of goods or services by another.  15 U.S.C. § 1125(a).[12]

2  In order to show trademark infringement, the plaintiff must

3  demonstrate that the defendant is "using a mark confusingly similar to

4  a valid, protectable trademark" owned by the plaintiff.  Brookfield

5  Commc'ns, Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1046 (9th Cir.

6  1999).  Federal registration of a trademark creates a presumption that

7  the mark is valid, but because Chroma has not registered its marks, it

8  cannot avail itself of this statutory presumption and must establish

9  that it owns a valid trademark that has been infringed.  See Glow

10  Indus., Inc. v. Lopez, 252 F. Supp. 2d 962, 976 (C.D. Cal. 2002).

11          1.   Validity

12       To be valid, a trademark must be "distinctive."  Zobmondo Entm't,

13  LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010).  Marks

14  are generally classified in one of five categories of distinctiveness:

15  (1) generic; (2) descriptive; (3) suggestive; (4) arbitrary; or (5)

16  fanciful.  Id.  "Suggestive, arbitrary, and fanciful marks are

17  considered 'inherently distinctive' and are automatically entitled to

18  federal trademark protection because 'their intrinsic nature serves to

19  identify a particular source of a product.'"  Id.  Generic marks are

20  never entitled to trademark protection and descriptive marks may

21  become protected if they have acquired "secondary meaning," that is,

22  "acquired distinctiveness 'as used on or in connection with the

23  [trademark owner's] goods in commerce.'"  Id.  The inquiry into

24  validity is an "'intensely factual issue,'" and "the factfinder's

25  function is to determine, based on the evidence before it, what the

26

27       [12]The parties agree that the analysis for Chroma's § 1125(a)
   claim and state-law claim is identical, so the Court will not address
   them separately.  See Walter v. Mattel, Inc., 210 F.3d 1108, 1111 (9th
28  Cir. 2000).

1  perception of the purchasing public is.'"  Id.

2      Chroma argues that its CHROMA marks are either inherently

3  distinctive as arbitrary or suggestive, or, if they are descriptive,

4  that they have acquired distinctiveness through secondary meaning,

5  whereas Boldface argues that the word "chroma" is either generic or

6  merely descriptive of cosmetics and beauty products without secondary

7  meaning inuring to Chroma's benefit.  The Court finds that, at this

8  stage, Chroma has demonstrated that a factfinder would likely find the

9  CHROMA marks suggestive for cosmetics, rendering the marks inherently

10  distinctive.

11                  a.   Arbitrary or Generic

12      At the outset, the Court can dispose of the parties' respective

13  arguments that the mark is either arbitrary or generic because the

14  evidence does not support either conclusion.

15      Arbitrary marks are "common words that have no connection with

16  the actual product — for example, 'Dutch Boy' paint."  Surfvivor

17  Media, Inc. v. Survivor Prods., 406 F.3d 625, 631—32 (9th Cir. 2005).

18  The parties agree that the term "chroma" is Latin for a classical

19  Greek word meaning "color," and in English it means the purity of

20  color saturation.  It appears in Webster's dictionary, although that

21  source notes that the term "chroma" standing alone has a chiefly

22  British usage.  (Mot. 8—9.)  It apparently functions more commonly as

23  a classical Greek root for English words coined in the Nineteenth

24  Century like "chromatic" and "chromatology."  Without citing evidence,

25  Chroma asserts that the term is "not widely known in the United

26  States."  (Id.)  Assuming these definitions are correct, the word

27  bears at least some connection to cosmetics because it refers to

28  color, and the makeup at issue here involves the use of color (e.g.,

eye-shadow, blush, lipstick, etc.).  Therefore, the word "chroma" is not arbitrary as used on cosmetics.

At the other end of the spectrum, a generic word "describe[s] the product in its entirety, and [is] not entitled to trademark protection. . . .  Examples include 'Liquid controls' for equipment that dispenses liquid, or 'Multistate Bar Examination' for a bar examination that may be taken across multiple states." Surfvivor, 406 F.3d at 632.  Boldface argues that the doctrine of "foreign equivalents" compels a finding that the term "chroma" is generic because it means "color" in Greek.  "Under the doctrine of foreign equivalents, foreign words from common languages are translated to English to determine genericness, descriptiveness, as well as similarity of connotation in order to ascertain confusing similarity with English word marks." Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772, 396 F.3d 1369, 1377 (Fed. Cir. 2005). One rationale behind the doctrine is to prevent merchants from "obtain[ing] the exclusive right over a trademark designation if that exclusivity would prevent competitors from designating a product as what it is in the foreign language their customers know best." Otokoyama Co. v. Wine of Japan Import, Inc., 175 F.3d 266, 270–71 (2d Cir. 1999).  The doctrine is not an absolute rule, though, and "'it does not mean that words from dead or obscure languages are to be literally translated into English for descriptive purposes.'"  In re Spirits Int'l, N.V., 563 F.3d 1347, 1351 (Fed. Cir. 2009) (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:34 (4th ed. 2009)).

Here, Chroma claims without much support that the doctrine does not apply because the word "chroma" was used in the ancient Greek

language as "color," and because that language has not been spoken for
over two thousand years, consumers would not translate it.  Boldface
does not respond to this point.  On this thin record, the Court finds
that the doctrine of foreign equivalents does not apply here because
there is no evidence that the buying public would translate "chroma"
to "color."  Absent an English translation of the term "chroma," the
evidence does not support a finding of the CHROMA marks are generic.

                    b.   Suggestive or Descriptive

     The crux of the validity question here is placing the word
"chroma" when used with cosmetics on one side of the suggestive/
descriptive line, and that determination is hardly "'an exact science
and is a tricky business at best.'"  Zobmondo, 602 F.3d at 1114.  "A
suggestive mark is one for which 'a consumer must use imagination or
any type of multistage reasoning to understand the mark's significance
. . . the mark does not describe the product's features, but suggests
them.'"  Id. (ellipsis and emphasis in original).  "By contrast, a
merely descriptive mark 'describes the qualities or characteristics of
a good or service' . . . 'in a straightforward way that requires no
exercise of the imagination to be understood.'"  Id.  This assessment
must be made "'by reference to the goods or services that it
identifies[.]'"  Id.  If a mark is considered merely descriptive, the
owner must show that the mark has acquired secondary meaning for it to
be protectable.  Id. at 1113.  A mark may be descriptive even if it
does not describe the "essential nature" of the product; "it is enough
that the mark describe some aspect of the product."  Id. at 1116.

     In the Ninth Circuit, the distinction between suggestive and
descriptive marks is assessed using two — and possibly three —
"tests": the "imagination" test, the "competitors' needs" test, and

potentially the "extent-of-use" test.  <u>Id.</u> at 1115—18.  Importantly, these tests are only criteria offering guidance and other evidence may be relevant.  <u>Id.</u> at 1115.

The imagination test is considered the "'primary criterion'" for evaluating distinctiveness, <u>id.</u> at 1116, and it looks to whether "'imagination or a mental leap is required in order to reach a conclusion as to the nature of the product being referenced,'" <u>id.</u> at 1115.  Boldface argues that the word "chroma" is descriptive of cosmetics because it simply means color.  The Court has already concluded that the doctrine of foreign equivalents does not apply, so there must be some evidence that consumers understand the word "chroma" to directly refer to color when it appears on cosmetics.  The word "chroma" is defined in the dictionary as the purity of color saturation, albeit the entry also notes that the word has a chiefly British usage.  (Mot. 8.)  Further, the PTO considers "chroma" descriptive when used with hair care and coloring products because it directly refers to color, such as "the purity of color, or its freedom from white or gray," or the "intensity of distinctive hue; saturation of color," or even as an aspect of color in the "Munsell color system by which a sample appears to differ from a grey in the same lightness or brightness and that corresponds to saturation of the perceived color."  (Thomas Supp. Decl. ¶ 7.)  In the abstract or related to hair-care products, then, "chroma" might generally refer to color or color saturation.

But for trademark purposes, the word must be considered "'by reference to the goods or services that it identifies[.]'"  <u>Zobmondo</u>, 602 F.3d at 1114.  Boldface has not demonstrated that consumers of <u>cosmetics</u> understand "chroma" to mean color on cosmetics, such that no

mental leap is required to understand the connection between "chroma" and those products.  To the contrary, cosmetics consumers must make one — and possibly a second — inferential leap: first, to understand that "chroma" refers to "color" or "color purity" or "saturation"; and second, to understand that color or color purity or saturation refers directly to cosmetics bearing the mark.  This connection is particularly attenuated for products that do not have an obvious connection to color, such as those reducing shine, lengthening eyelashes, or toning the skin.  The mental leap required by customers is underscored by Chroma's own use of the word "chroma" on its products alongside the word "color," which suggests that consumers do not immediately understand the word "chroma" to mean color on cosmetics.  (Casino Decl. ¶ 5 (explaining that Chroma "chose the name CHROMA for the studio and CHROMA COLOUR for [its] product line because [it] wanted [its] cosmetics to be about color."); see also Ostoya Decl., Ex. A (using tagline "COLOR • PURITY • YOU" and naming product categories "Lip Colours," "Eye Colours," and "Cheek Colours").)  Therefore, the imagination test weighs in favor of finding the CHROMA marks suggestive.

     The competitors' needs test "'focuses on the extent to which a mark is actually needed by competitors to identify their goods or services.'"  Zobmondo, 602 F.3d at 1117.  This test is related to the imagination test "'because the more imagination that is required to associate a mark with a product or service, the less likely the words used will be needed by competitors to describe their products or services.'"  Id.

     This test weighs in favor of finding the CHROMA marks suggestive because competitors likely do not need to use the word "chroma" to

describe their own cosmetics.  Because Boldface has not demonstrated that the doctrine of foreign equivalents applies, competitors could readily use the words "color," "purity," "hue," or any number of other words to describe that aspect of their products.  See <u>Entrepreneur Media, Inc. v. Smith</u>, 279 F.3d 1135, 1143 (9th Cir. 2002) ("[I]f there are numerous synonyms for a common trademarked word, others will have less need to use the trademarked term.").[13]

The extent-of-use test "evaluates 'the extent to which other sellers have used the mark on similar merchandise,'" which may indicate that the term is merely descriptive of a class of products, although the Ninth Circuit has not formally adopted this test as a factor in determining distinctiveness.  <u>Zobmondo</u>, 602 F.3d at 1118.

Chroma claims that this test is limited to direct competitors, and Boldface is its only direct competitor.[14]  Yet, in <u>Zobmondo</u> the Ninth Circuit merely required a showing of uses on "similar

---

[13]Boldface cites some instances of other products using the word "chroma" on cosmetics to denote color, such as bareMinerals Prime Time Primer Shadow Chroma Violet, Mac Chroma Copper Cobra eye shadow, and Mac Nail Laquer in Chroma Copper Cobra.  (Mantell Supp. Decl., Ex. B.)  While "[w]idespread <u>use</u> of a word by others may serve as confirmation of the <u>need</u> to use that word," <u>Entrepreneur</u>, 279 F.3d at 1143 (emphasis in original), this is far from widespread use of the word "chroma" to directly mean "color" that would suggest that competitors need to use the word "chroma" to describe cosmetics.  Boldface also cites products called Color Me Beautiful Chroma Soft Eye Pencils, New York Color Chroma Lip Gloss, and New York Color Chroma Face Glow.  (Mantell Supp. Decl., Ex. B.)  Given that these products use both the words "color" and "chroma," these products do not demonstrate that producers need the word "chroma" to describe their products.

[14]Chroma notes two other companies that use variants of the word "chroma" on cosmetics, but Chroma does not regard either one as a competitor because Chroma was unaware of them: Lee Tillett, Inc., which has a federal registration for the mark KROMA for cosmetics (Def.'s RJN, Ex. 1 at 173; Thomas Decl. ¶ 3); and Biotherm of Monaco, which has used the mark RIDES REPAIR CHROMA-LIFT for face cream since 2009.  (Rey Reply Decl. ¶ 3.)

merchandise," not use on directly competing products.  Id.  Indeed, in
that case the court considered third-party uses of the term at issue
in websites, copyright registrations, and books in evaluating the
parties' use of the mark on board games.  Id. at 1118—19; see also
Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns, Inc., 198 F.3d
1143, 1151 (9th Cir. 1999) (citing Los Angeles Times article using
term at issue "in a generic sense"); Surgicenters of Am., Inc. v. Med.
Dental Surgeries, Co., 601 F.2d 1011, 1013, 1017 n.17 (9th Cir. 1979)
(citing magazine and medical journal articles, letters, television
transcripts, and a proposed federal regulation using the term at issue
to determine whether term was generic or descriptive).

     Boldface has proffered evidence of uses of the word "chroma" on
cosmetics and for beauty salons (Mantell Decl., Ex. B) and in numerous
PTO applications and registrations using the word "chroma" with
cosmetics and hair-care and similar products.  But this evidence only
has limited value.  As discussed more fully below, the PTO records
support the conclusion that the Chroma marks are inherently
distinctive, not merely descriptive as Boldface contends.  Likewise,
Boldface's other evidence of third-party uses does not necessarily
demonstrate distinctiveness in the absence of contextual evidence of
how the marks were used, whether the products bearing the marks were
well-promoted, or whether the marks were recognized by customers.  See
Zobmondo, 602 F.3d at 1119 ("And Zobmondo's evidence of third-party
use, without contextual information such as sales figures and
distribution locations, falls short of establishing a long-standing
consumer understanding" of the mark at issue); see also id. at 1119
n.11.  As a result, the extent-of-use test is at best inconclusive of
distinctiveness.

1    Apart from the three tests identified in <u>Zobmondo</u>, Boldface cites
2    32 current trademark registrations, 20 cancelled registrations, and 13
3    pending registrations using "chroma" or slight variants to argue that
4    the PTO treats the word "chroma" as descriptive of various types of
5    beauty products.  (Def.'s RJN, Ex. 1.)  Even in the absence of the
6    presumption of validity arising from a federal registration, "courts
7    may . . . defer to the PTO's registration of highly similar marks."
8    <u>Lahoti v. Vericheck, Inc.</u>, 586 F.3d 1190, 1199 (9th Cir. 2009).
9    Therefore, the PTO's registration of a similar mark is "evidence of .
10   . . distinctiveness," so long as the registered mark and the disputed
11   mark have "strong similarity" in "appearance and purposes."  <u>Id.</u>
12   However, many third-party registrations using a similar term can in
13   some cases demonstrate that a mark is descriptive, not suggestive, by
14   showing that "'those third parties and the public consider such a
15   [term] descriptive, such that there will be no likely confusion[.]'"
16   <u>Id.</u> at 1200.  Importantly, the Court might rely exclusively on strong
17   evidence of similar registrations to determine distinctiveness.  <u>Id.</u>
18   at 1204.

19       The PTO has found the word "chroma" or its variants inherently
20   distinctive on cosmetics eight times since 1990 (Thomas Decl. ¶ 3):

21       •    RIDES REPAIR CHROMA-LIFT for "cosmetics, namely creams for
22            the face," with REPAIR disclaimed (U.S. Reg. No. 3958286);

              •    CROMA HEALTH CARE INNOVATION & design for "cosmetics," with
23                 HEALTH disclaimed (U.S. Reg. No. 3746910);

24       •    KROMA for "cosmetics" generally (U.S. Reg. No. 4079066);

25       •    CHROMA GEL for products related to artificial nails, with
                  GEL disclaimed (U.S. App. Ser. No. 85375699, allowed for
26                registration on Principal Register);

27       •    REVLON CHROMA CHAMELEON for "nail enamel" (U.S. App. Ser.
                  No. 85646764, published for opposition and, if no opposition
28                is filed, allowed for registration on Principal Register);

- CHROMA LUMINESCENT for "cosmetics, non-medicated skincare preparations, non-medicated hair-care preparations, non-medicated body care preparations, namely, cosmetic preparations for body care" (U.S. App. Ser. No. 85667308, published for opposition and, if no opposition is filed, allowed for registration on Principal Register);

- CHROMA-WEAR for "nail polish" (U.S. Reg. No. 1597085, cancelled in 1996); and

- KROMA BONDZ for skin care, hair care, and cosmetic products (U.S. Reg. No. 2541170, cancelled in 2008).

Not all of these registrations and applications involve precisely identical marks and some of the marks are not used on identical products (such as REVLON CHROMA CHAMELEON and CHROMA-WEAR for nail products). Nevertheless, they all involve similar enough marks used on similar enough goods to support a conclusion that Chroma's marks are inherently distinctive. In fact, the registration for KROMA on cosmetics is particularly probative of suggestiveness because of its similarity to Chroma's marks for cosmetics. See Lahoti, 586 F.3d at 1194, 1199 (noting the "strong similarity" between the registered "Vericheck" mark for "check verification services" and the disputed "VeriCheck" mark for "Check Verification and Check Collection Services").

To rebut this evidence, Boldface cites several registrations — all obtained by the company L'Oreal — for trademarks using the word "chroma" for hair coloring and related hair products that either were registered on the Supplemental Register or included a disclaimer[15] for the word "chroma," both of which would indicate that the PTO

---

[15]See Trademark Manual of Examining Procedure ("TMEP") § 1213 ("A disclaimer is a statement that the applicant or registrant does not claim the exclusive right to use a specified element or elements of the mark in a trademark application or registration. A disclaimer may be included in an application as filed or may be added by amendment, e.g., to comply with a requirement by the examining attorney.").

considered the word "chroma" descriptive for that category of
products.  (Def.'s RJN, Ex. 1 at 42 (CHROMA PERFECT, U.S. Reg. No.
3125361, CHROMA disclaimed); <u>id.</u> at 47 (CHROMA REFLECT, U.S. Reg. No.
3025362, CHROMA disclaimed); <u>id.</u> at 56 (CHROMA GLOSS, U.S. Reg. No.
3497385, Supplemental Register); <u>id.</u> at 61 (CHROMA RICHE, U.S. Reg.
No. 3533396, CHROMA disclaimed); <u>id.</u> at 103 (CHROMA SENSITIVE, U.S.
Reg. No. 3930217, Supplemental Register); <u>id.</u> at 162 (CHROMA CRISTAL,
U.S. Reg. No. 3956949, CHROMA disclaimed); <u>id.</u> at 167 (CHROMA CARE,
U.S. Reg. No. 3996377, CHROMA disclaimed); <u>id.</u> at 322 (CHROMA PROTECT,
U.S. Reg. No. 3043475, CHROMA disclaimed).)  As noted previously, for
three of these registrations (CHROMA SENSITIVE, CHROMA GLOSS, and
CHROMA REFLECT), the PTO explained that the word "chroma" means color
"purity" or "saturation," and that it was descriptive of hair coloring
and related products.  (Thomas Supp. Decl. ¶ 7.)

        These registrations are not strong evidence that the word
"chroma" is descriptive on cosmetics for at least two reasons.  First,
there is some evidence to suggest that the PTO views the use of the
word "chroma" on cosmetics differently than on hair-care products.
For example, the PTO has not cited likely confusion with marks for
cosmetics as a reason for refusing to register any of the marks for
hair-care products with the word "chroma." (Thomas Supp. Decl. ¶ 6.)
<u>See Lahoti</u>, 586 F.3d at 1201 ("Whether a mark is suggestive or
descriptive 'can be determined only by reference to the goods or
services that it identifies.'").

        Second, the PTO appears to have an inconsistent practice of
treating the word "chroma" as descriptive even within the category of
hair-care products.  Chroma points to at least six additional
registrations and applications on the Principal Register using the

word "chroma" for similar hair-care products as to which the PTO did not require either a disclaimer of the word "chroma" or require that the registrations be included on the Supplemental Register. (Thomas Decl. ¶ 4; Def.'s RJN, Ex. 1 at 122 (CHROMA LABS for hair color, hair conditioners, hair gels, hair lotions, hair shampoo, and hair spray, U.S. Reg. No. 3420241); id. at 224 (CHROMA PERFECT by L'Oreal for the same categories as L'Oreal's other registrations, U.S. App. Ser. No. 85694590); id. at 246 (CHROMA-FIL for hair color, U.S. Reg. No. 1000025, expired 1995); id. at 252 & 257 (CLAIROL CHROMA for permanent wave lotion and hair coloring preparations, U.S. Reg. No. 1159644, canceled in 1988, and U.S. Reg. No. 1255733, canceled in 1990); id. at 279 (CHROMA-LOCK for hair color, U.S. Reg. No. 1864153, canceled in 2005).) This inconsistent practice is perhaps best exemplified by the two identical applications for CHROMA PERFECT filed by the L'Oreal company six years apart: the PTO required a disclaimer of "chroma" in the first one but not in the second. (Compare Def.'s RJN, Ex. 1 at 42 with id. at 224.) In the end, the PTO's consistent treatment of the word "chroma" on cosmetics as inherently distinctive carries far more weight in this case than the PTO's inconsistent treatment of the word "chroma" on hair-care products as merely descriptive.[16]

---

[16]Adding yet another layer of complication, some applications and registrations cover both cosmetics and hair-care products. (Def. RJN, Ex. 1 at 80 (CHROMAVIS), 113 (CHROMASILK), 132 (CHROMABRIGHT), 149 LIPOCHROMAN), 184 (CHROMASYNC), 218 (CHROMA LUMINESCENT), 284 (KROMA BONDZ), 306 (HYDROCHROMATIC), 316 (GAMMA CROMA).) Boldface cites these registrations, as well as 1,182 active registrations for other marks for both cosmetics and hair-care products (Mantell Supp. Decl., Ex. A), to argue that cosmetics and hair-care products are related and therefore the PTO's treatment of the word "chroma" as descriptive of hair-care products applies to cosmetics. But this evidence actually shows the opposite — all the cited registrations including the word "chroma" appear on the Principal Register with no disclaimers, so they
(continued...)

1          c.   Conclusion on Validity

2       Chroma has demonstrated that the imagination test, the

3  competitors' needs test, and the records from the PTO all weigh in

4  favor of finding Chroma's marks inherently distinctive.  Therefore,

5  Chroma will likely demonstrate that its Chroma marks are valid without

6  also showing that the marks have achieved secondary meaning.

7          2.   Likelihood of Confusion

8       The touchstone of a Lanham Act claim is the likelihood of

9  consumer confusion, which "requires the factfinder to determine

10  whether a 'reasonably prudent consumer in the marketplace is likely to

11  be confused as to the origin of the good or service bearing one of the

12  marks.'"  Surfvivor, 406 F.3d at 630.  Likelihood of confusion is

13  determined by evaluating the familiar factors outlined in AMF Inc. v.

14  Sleekcraft Boats, 599 F.2d 341, 348—49 (9th Cir. 1979): (1) strength

15  of the marks; (2) relatedness of the goods; (3) similarity of the

16  marks; (4) evidence of actual confusion; (5) marketing channels; (6)

17  degree of consumer care; (7) defendant's intent in selecting the mark;

18  and (8) likelihood of expansion of the product lines.  Surfvivor, 406

19  F.3d at 631.  "[T]his eight-factor test for likelihood of confusion is

20  pliant," so the "relative importance of each individual factor will be

21  case-specific" and even a "subset of the factors" could demonstrate

22  likely confusion.  Brookfield, 174 F.3d at 1054.

23       In this case, Chroma's claim is based on "reverse confusion,"

24  rather than the more common "forward confusion."  The difference

25  between forward and reverse confusion turns on how consumers are

26

27       [16](...continued)
   show that the PTO treats the word "chroma" as inherently distinctive
28  when used on both cosmetics and hair-care products.

22

potentially deceived as to source: "Forward confusion occurs when customers believe that goods bearing the junior mark came from, or were sponsored by, the senior mark holder," whereas "reverse confusion occurs when consumers dealing with the senior mark holder believe that they are doing business with the junior one."  Surfvivor, 406 F.3d at 630 (citing Dreamwerks Prod. Group, Inc. v. SKG Studio, 142 F.3d 1127, 1129—30 & n.5 (9th Cir. 1998)).  Claims of reverse confusion "protect the small senior user from losing control over its identity in 'the rising tide of publicity associated with the junior mark.'"  Walter v. Mattel, Inc., 210 F.3d 1108, 1110 (9th Cir. 2000).  In the reverse confusion context, the first three Sleekcraft factors are "pivotal."  Dreamwerks, 142 F.3d at 1130; Glow, 252 F. Supp. 2d at 986.

### a.   Strength of the Mark

"'The stronger a mark — meaning the more likely it is to be remembered and associated in the public mind with the mark's owner — the greater the protection it is accorded by the trademark laws.'"  Network Automation, Inc. v. Advanced Sys. Concepts, Inc., 638 F.3d 1137, 1149 (9th Cir. 2011).  In assessing a mark's strength, the Court must analyze both its "conceptual" and "commercial" strength.  Id. Conceptual strength involves classifying the mark on the spectrum of distinctiveness, while commercial strength is based on "'actual marketplace recognition,'" including advertising expenditures.  Id.; see also Glow, 252 F. Supp. 2d at 989 (noting that commercial strength is evaluated in light of "any advertising or marketing campaign by the junior user that has resulted in 'a saturation in the public awareness of the junior user's mark.'").  In reverse confusion cases, the Court evaluates the conceptual strength of the senior user, but for commercial strength, "the focus is on the relative strengths of the

marks so as to gauge the ability of the junior user's marks to
overcome the senior user's mark." _Visible Sys. Corp. v. Unisys Corp._,
551 F.3d 65, 74 (1st Cir. 2008).

As to conceptual strength, because Chroma's marks are suggestive,
they are inherently distinctive but conceptually weak. _See_
_Brookfield_, 174 F.3d at 1058 ("We have recognized that, unlike
arbitrary or fanciful marks which are typically strong, suggestive
marks are presumptively weak."); _Glow_, 252 F. Supp. 2d at 990.
Moreover, there are many third-party uses of the word "chroma" on
cosmetics and related beauty products, creating a "crowded field" that
greatly diminishes the strength of Chroma's marks as source-
identifiers and entitling those marks to a "very limited scope of
protection." _See Glow_, 252 F. Supp. 2d at 990—91 (finding suggestive
mark weak because it "competes in an exceedingly crowded field of
beauty products using the word 'glow' in some manner as a trade name
or trademark"); _see also Miss World (UK) Ltd. v. Mrs. Am. Pageants,_
_Inc._, 856 F.2d 1445, 1449 (9th Cir. 1988) ("'[A] mark which is hemmed
in on all sides by similar marks on similar goods cannot be very
"distinctive." It is merely one of a crowd of marks. In such a
crowd, customers will not likely be confused between any two of the
crowd and may have learned to carefully pick out one from the
other.'").

As to the parties' comparative commercial strength, the Chroma
marks are not commercially strong, whereas Boldface's marks are.
Chroma does not advertise in media, and instead relies on word-of-
mouth referrals. Although that might have created some recognition
among consumers, there is no evidence that this recognition is
widespread or strong for this reason. Chroma has annual sales of

approximately $400,000 to $550,000 (only 40% of which is from products), which includes increasing sales between 2001 and 2007, and then again between 2010 and 2012.  But those sales are not presented in context, so there is no way to gauge how much strength those sales created in the cosmetics industry generally, or even in the high-end cosmetics market specifically.  See Glow, 252 F. Supp. 2d at 983 ("'Whether a volume of sales is significant will vary with the product and the market.  The numbers that result in . . . relief in one case may not be significant in another.'").  On this record, Chroma has not demonstrated that its marks are particularly strong commercially.

On the other hand, Boldface's marks are backed by the Kardashian's nationwide fame, and Boldface's product line has received extensive nationwide media coverage, has been shown to millions of viewers on an episode of the Kardashians' reality television show, has been promoted on each of the Kardashian sisters' websites, and has its own Facebook page with 52,000 "likes."  The products are now in approximately 4,500 retail stores throughout the United States, and by April 2013 the products will be available on Boldface's website.  And this is just Boldface's initial launch.  Boldface's "ability to saturate the marketplace creates a potential that consumers will assume that [Chroma's] mark refers to [Boldface], and thus perceive that the businesses are somehow associated."  Cohn v. Petsmart, Inc., 281 F.3d 837, 842 (9th Cir. 2002).

While Boldface's commercially strong mark generally weighs in favor of likely confusion, this factor is mitigated by the conceptual weakness of Chroma's marks.  See Glow, 252 F. Supp. 2d at 990 (finding that the likelihood of overwhelming the senior user in the marketplace was "offset" by the conceptual weakness of the senior user's

suggestive mark in a crowded field of products).  Given the number of cosmetics and related beauty products that use the word "chroma," the Court is not convinced that consumers who encounter Chroma's products will automatically believe they are associated with Boldface's products, even given Boldface's strong commercial presence.  Id. at 991 ("The key question in such a case is whether consumers who encounter [the senior user's] products will believe that they are associated with defendants' [products].").  Thus, this factor is at most neutral in the likelihood of confusion analysis.

> b.  Relatedness of the Goods

Under this factor, parties need not be direct competitors, but the goods must be "reasonably thought by the buying public to come from the same source if sold under the same mark." Rearden LLC v. Rearden Commerce, Inc., 683 F.3d 1190, 1212 (9th Cir. 2012) (internal quotation marks omitted).  The ultimate question is whether customers are "'likely to associate' the two product lines." Surfvivor, 406 F.3d at 633.

In this case, the parties sell similar cosmetics, and some of the products are identical (such as mascara, lip sets, and eye shadow).  Although Chroma offers its products at a somewhat higher price point than Boldface's products and does not offer products in mass retailers, these differences are not significant enough that the products should be viewed as completely unrelated.  Cosmetics selling at different price points are commonly sold at the same national retail chains, including Ulta, where Boldface's products are sold, and customers might buy some higher-end items and some lower-end items at the same time.  (Sobiesczyk Decl. ¶ 19.)  Consumers also commonly see both higher-end brands and lower-end brands from the same company.

1  (Rae Decl. ¶ 6.)

2      Boldface argues that the parties' products are not closely

3  related because Chroma's primary business is a "makeup studio," Chroma

4  provides its products with "expert consultation," and Chroma has

5  brick-and-mortar stores, whereas Boldface does not offer any services

6  and has no brick-and-mortar stores.  But those differences are

7  irrelevant to whether the <u>products</u> are closely related.  Here, that is

8  undeniably true, such that the buying public might reasonably believe

9  Chroma's products are from the same source as Boldface's products.

10      Boldface also argues that this factor weighs less heavily in

11  favor of finding likely confusion when "advertisements are clearly

12  labeled or consumers exercise a high degree of care" in purchasing

13  cosmetics, "because rather than being misled, the consumer would

14  merely be confronted with choices among similar products."  <u>Network</u>

15  <u>Automation</u>, 638 F.3d at 1150.  Under the circumstances, the Court

16  agrees.  Purchasers of elite, high-end cosmetics likely exercise care

17  in their purchasing decisions and Chroma repeatedly emphasizes the

18  elite nature of its higher-priced products and services, which are

19  primarily offered for sale in Chroma's boutique stores.  Further,

20  Boldface's products, advertising, and promotional materials are

21  conspicuously labeled with Boldface's full mark KHROMA BEAUTY BY

22  KOURTNEY, KIM AND KHLOE and in connection with the Kardashians' names,

23  images, and likenesses (Ostoya Decl. ¶ 15), such that consumers more

24  likely choose among competitors, rather than experience confusion as

25  to the source of the products.  Given these mitigating facts, the

26  factor of relatedness of the goods weighs only slightly in favor of

27  finding a likelihood of confusion.

28

27

1                     c.   <u>Similarity of the Marks</u>

2       "'The more similar the marks in terms of appearance, sound, and

3 meaning, the greater the likelihood of confusion.'"  <u>Network</u>

4 <u>Automation</u>, 638 F.3d at 1150.  In evaluating appearance, sound, and

5 meaning, the Court follows three "axioms": "first, the marks must be

6 considered in their entirety and as they appear in the marketplace;

7 second, similarity is adjudged in terms of appearance, sound, and

8 meaning; and third, similarities are weighed more heavily than

9 differences."  <u>GoTo.com, Inc. v. Walt Disney Co.</u>, 202 F.3d 1199, 1206

10 (9th Cir. 2000).

11       <u>Meaning</u>.  Chroma claims that CHROMA and KHROMA have the same

12 meaning, derived from ancient Greek to mean "color."  Boldface does

13 not respond to this point, so the Court will treat their meaning as

14 identical and weigh this subfactor in favor of likely confusion.

15       <u>Sound</u>.  The words CHROMA and KHROMA sound identical, despite the

16 different spelling.  <u>See</u> <u>Surfvivor</u>, 406 F.3d at 633 (treating

17 "survivor" and "surfvivor" as phonetically "nearly identical").

18 Although each parties' marks include other surrounding words, those

19 words may not always be spoken together with the words CHROMA and

20 KHROMA, especially in this case, where Chroma relies exclusively on

21 word-of-mouth for its advertising.  <u>See</u> <u>Sleekcraft</u>, 599 F.2d at 351

22 ("Sound is also important because reputation is often conveyed word-

23 of-mouth.").[17]  This subfactor weighs in favor of finding likely

24

25      [17]Chroma claims that the Kardashians and the public refer to
Boldface's product line simply as KHROMA, so the marks sound alike,
26 despite any other words the parties may use.  (Sobiesczyk Decl. ¶ 25;
Sobiesczyk Reply Decl. ¶ 3.)  <u>See</u> <u>Rearden</u>, 683 F.3d at 1212 (finding
27 fact that defendant referred to itself as simply "Rearden" weighed in
favor of likely confusion).  This claim is based entirely on a
28                                                  (continued...)

confusion.

Sight. As the marks are used in the marketplace, they most often appear dissimilar to consumers. Chroma's marks include CHROMA, CHROMA COLOUR, CHROMA MAKEUP STUDIO, and CHROMA MAKEUP STUDIO along with a "C" design, and Chroma's CHROMA is written with some letters larger than others, whereas Boldface's KHROMA is written with uniformly sized letters in a distinctive font and Boldface's products all bear the full mark KHROMA BEAUTY BY KOURTNEY, KIM AND KHLOE, and appear alongside the Kardashians' names, images, and likenesses. See Entrepreneur, 279 F.3d at 1145 (finding that "Entrepreneur" and "Entrepreneur Illustrated" appeared different in text given the addition of "an entire four-syllable word" that made one mark "twice as long — to the eye and the ear" as the other). On the other hand, as noted supra n.17, sometimes the marks are referred to in writing simply as "KHROMA" and some retailers occasionally use the word "KHROMA" to identify Boldface's products online without referring to the Kardashians or showing Boldface's entire logo. (Sobiesczyk Decl. ¶¶ 22—25, Exs. 11—13.)

Chroma argues that the Court should strip away generic and descriptive words from the parties' marks, such as MAKEUP STUDIO, BEAUTY, and KOURTNEY, KIM AND KHLOE, and examine only the "dominant" words CHROMA and KHROMA for visual similarity. That approach is

---

[17](...continued)
paralegal's declaration, which is in turn based upon only written evidence, i.e., websites where KHROMA BEAUTY products are sold, comments on KHROMA BEAUTY's facebook page, Kim Kardashian's blog entries, and written press coverage. Although this is not direct evidence of how the marks "sound," the Court may infer from the use of the word "KHROMA" in writing that the Kardashians and the public likely use the word "KHROMA" alone when speaking about Boldface's products.

contrary to the Ninth Circuit's dictate to look at the marks as a whole and as they appear in the marketplace.  See GoTo.com, 202 F.3d at 1206.  Even if the Court stripped away all other words except CHROMA and KHROMA or considered only those instances in which Boldface's products are simply referred to as "KHROMA," the two words are still spelled differently, with Boldface replacing the "C" with a "K" to associate the brand with the Kardashians, who tend to create brands by replacing "C" words with a "K."  (Mot. 15.)  But see Dreamwerks, 142 F.3d at 1131 (expressing uncertainty that "substituting one vowel for another and capitalizing a middle consonant dispels the similarity between the marks.")  That spelling change also appears with the Kardashian's names, images, and likenesses on all packaging.[18]

In some reverse confusion cases, the addition of a "house mark" may aggravate, rather than mitigate, confusion by enhancing the risk that consumers would associate the plaintiff's products with the defendant.  See Glow, 252 F. Supp. 2d at 995.  But see Cohn, 281 F.3d at 842 (noting in reverse confusion case that the "emphasis on [] housemarks 'has the potential to reduce or eliminate likelihood of confusion.'").  At this stage, there is no evidence to suggest that consumers would more likely associate Chroma's products with Boldface

---

[18]Chroma claims that Boldface undermined its argument that the marks in this case are visually dissimilar because, in the Lee Tillett, Inc., complaint, Boldface alleged that KROMA "is simply a phonetic and misspelled equivalent of the term CHROMA."  (Tillett Compl. ¶ 41.)  But that allegation was made in the context of Boldface's allegations that KROMA was a descriptive or generic term meaning "color," and Tillett's misspelling of it still meant "color."  (Id. ¶ 44.)  Therefore, Boldface's position in that lawsuit is not necessarily inconsistent with its position here in the context of likelihood of confusion.

1   through the addition of the Kardashians' names and images on

2   Boldface's products.  At most, then, the use of the Kardashians' names

3   and images is inconclusive on the issue of visual similarity.  Thus,

4   given that the word "KHROMA" occasionally appears standing alone, the

5   visual similarity subfactor weighs slightly in favor of a likelihood

6   of confusion.

7        In sum, the overall similarity factor weighs slightly in favor of

8   finding a likelihood of confusion — the marks sound identical and have

9   the same meaning, and they sometimes appear similar in the

10  marketplace.

11              d.   Actual Confusion

12       Although not required, "'actual confusion among significant

13  numbers of consumers provides strong support for the likelihood of

14  confusion.'"  Network Automation, 638 F.3d at 1151.  Chroma cites more

15  than 50 purported instances of actual confusion.  As explained below,

16  at most, seven of those instances demonstrate actual confusion, which

17  still strongly supports finding likely confusion.[19]

18       The vast majority of Chroma's evidence of actual confusion does

19  _____

20       [19]The Court can quickly dispose of several of Boldface's
    arguments under this factor.  First, statements by customers that they
21  were confused are not barred as hearsay because they fall within the
    state-of-mind exception to the hearsay rule.  See Lahoti v. Vericheck,
22  Inc., 636 F.3d 501, 509 (9th Cir. 2011).  Second, Boldface points out
    that all but 11 instances of actual confusion occurred after October
23  29, 2012, when Chroma posted a notice on its website that it was not
    related to the Kardashians' products and urging customers to "voice
24  your support for Chroma Makeup Studio's defense of its reputation and
    primary brand by spreading this message through social media."  (Opp.
25  18—19.)  Boldface argues that this message "invited" the comments
    Chroma offers as evidence of actual confusion and the Court should
26  discount the evidence for that reason.  But there is nothing to
    suggest that the seven customer comments the Court considers probative
27  of actual confusion came in response to Chroma's message or were
    otherwise invited by Chroma.
28

                              31

not show any confusion at all; to the contrary, these comments reflect a clear understanding of the difference between the sources of Chroma's and Boldface's products. For example, many comments by current customers expressed concern that non-purchasers may be confused into believing that the customers use Boldface's makeup and not Chroma's makeup. (Rey Decl., Ex. 2, Entry Nos. 3, 11, 18—20, 24, 27, 29, 30, 32, 37, 38, 41, 43—47; Rey Reply Decl., Ex. 3.) Not only do these customers understand the difference between the parties' products, but they are simply stating their own opinions on the legal issue in this case — whether there is a likelihood of confusion — which are not probative for that purpose. Chroma also cites comments by customers it claims show confusion as to source or affiliation, but those comments also demonstrate that the individuals understood that the products were not affiliated and came from different sources. (Rey Decl., Ex. 2, Entry Nos. 42, 48; Rey Reply Decl., Ex. 5.) The Court has reviewed the rest of the comments cited by Chroma and, with the exception of the instances discussed below, they do not show actual confusion. (Rey Decl., Ex. 2, Entry Nos. 1, 2, 4—7, 9, 10, 12—16, 21, 22, 25, 26, 28, 31, 33, 36, 39; Rey Reply Decl., Exs. 2, 4.)

Chroma cites seven comments that show actual consumer confusion between the source or affiliation of the parties' products:

- A user commented on Chroma's Facebook page, "I am embarrassed to say I was channel surfing and I saw the episode where they were talking about their make up line and I thought, 'Wow, Lisa is in business with them?'" (Rey Decl., Ex. 2, Entry No. 17.)

- A customer said in an email, "So I heard from a friend of a friend that Chroma was coming out with a line of products at CVS? Is that true? I am so confused — that doesn't really seem like your/Michael's style . . . Is the line going to have all the same products?" (Id., Entry No. 23.)

- A customer said she was "very upset at the confusion" and she "had hoped it was something good happening for Chroma when she heard what she thought was that Chroma expanding into so many new stores.  She found out from Lisa Casino today that it is not CHROMA but actually KHROMA products that are going to be carried by all of those stores." (Id., Entry No. 34.)

- A customer commented that she saw the news about KHROMA and thought "there must be some mistake"; she said she was "very confused." (Id., Entry No. 35.)

- Two people contacted Chroma asking whether Chroma carried KHROMA faux eyelashes.  (Id., Entry Nos. 49, 50.)

- A customer commented on Chroma's Facebook page, "Are you working now with the Kardashians and the Khroma line?  It seems to be a lower end line perhaps?  I'm confused . . . did not know you were doing this??" (Rey Reply Decl., Ex. 2.)[20]

Boldface's KHROMA BEAUTY product launch is in its early stages, and yet Chroma has been able to show actual confusion has already occurred in the marketplace.  Given that the Ninth Circuit has completely discounted the lack of evidence of actual confusion at the preliminary injunction stage, a showing of actual confusion here weighs heavily in favor of finding a likelihood of confusion.  See

---

[20]Chroma cites three other comments that arguably show actual confusion: a customer said her daughter told her she had heard that Chroma was going into a lot of stores like CVS and that she thought maybe she could get the Lip Veneer she loves, but did not realize that the products being offered at CVS are KHROMA BEAUTY products (Rey Decl., Ex. 2, Entry No. 40); a hairstylist said to Chroma, "My clients that we share are tripping out and a little confused about the Kardashians makeup line.  They think it[']s yours, and it's so cheap." (Rey Reply Decl., Ex. 1); and someone commented on Kim Kardashian's Facebook page, "you STOLE the brand name and got my mom confused from the good one in BEVERLY HILLS!" (Rey Reply Decl., Ex. 6).  These comments are hearsay not within the state-of-mind exception because they are being offered to prove the facts asserted — that the customer, the hairdresser, and the individual commenting on Facebook observed others being confused about the parties' products.  Although the Court can consider hearsay evidence at the preliminary injunction stage, Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984), these hearsay statements have little probative value without other indicia of reliability.

33

1  Network Automation, 638 F.3d at 1151; GoTo.com, 202 F.3d at 1208.

2                    e.   Overlapping Marketing Channels

3       "'Convergent marketing channels increase the likelihood of

4  confusion.'"   Network Automation, 638 F.3d at 1151.   Here, there is

5  some overlap between the parties' marketing channels, which weighs

6  somewhat in favor of a likelihood of confusion.   Although the parties

7  target different segments of the cosmetics market — Chroma's higher-

8  end products are sold through its stores and through its own website,

9  while Boldface's products are lower-priced and sold in retail store

10 chains — both parties' products have been featured in the same fashion

11 magazines.   The fact that both parties sell products online adds

12 little weight to this factor.   See id. (noting that "the shared use of

13 a ubiquitous marketing channel" like the internet "does not shed much

14 light on the likelihood of consumer confusion").

15                    f.   Degree of Customer Care

16      Low consumer care increases the likelihood of confusion.   Id. at

17 1152.   This factor focuses on the nature, cost, and marketing channels

18 of the goods at issue.   Id. As touched on above, this factor weighs

19 against a likelihood of confusion because, as Chroma admits, its

20 clients are "sophisticated and exercise care" in selecting Chroma's

21 elite, higher-priced products and services.   (Reply 19.)   While Chroma

22 argues that the sophistication of its clients has no bearing on the

23 sophistication of non-purchasers, it cites nothing to support this

24 point.   To the contrary, "'[i]n assessing the likelihood of confusion

25 to the public, the standard used by the courts is the typical buyer

26 exercising ordinary caution[.]'"   Network Automation, 638 F.3d at 1152

27 (emphasis added).   For cosmetics, the typical buyer would likely take

28 great care when choosing between higher-priced, elite cosmetics like

1  Chroma's and lower-priced mass-marketing retail cosmetics like
2  Boldface's.

g.   Intent

4      Te intent factor carries only minimal weight because "'an intent
5  to confuse customers is not required for a finding of trademark
6  infringement.'"  GoTo.com, 202 F.3d at 1208.  Boldface's principals
7  identified the mark KHROMA BEAUTY and then their attorneys conducted a
8  search revealing Chroma's use of the word "chroma" on cosmetics among
9  many third-party uses.  Boldface believed that these uses rendered the
10 mark generic or merely descriptive, leaving Boldface free to use it on
11 their KHROMA BEAUTY products.  Although the Court has found that
12 Chroma's marks are suggestive on cosmetics, Boldface's position was at
13 least arguable.  Given that Boldface's intent appears to be innocent,
14 this factor is neutral.  See id. (finding the lack of intent to copy
15 "prove[d] nothing since no such intent is necessary to demonstrate a
16 likelihood of confusion"); M2 Software, Inc. v. Madacy Entm't Corp.,
17 421 F.3d 1073, 1085 (9th Cir. 2005) (finding no ill intent from
18 knowledge of mark and attempt to "carve out" a non-infringing mark).

h.   Expansion of Product Lines

20     The expansion of product lines factor does not carry much weight
21 here because the parties already directly compete to some extent.  See
22 Network Automation, 638 F.3d at 1153 (finding expansion factor
23 "unimportant" because parties already directly competed).  To the
24 extent Chroma argues that Boldface has thwarted its opportunities to
25 branch into upscale mass retailers, which might result in further
26 direct competition, the evidence does not support this conclusion.
27 Chroma has not offered evidence of any concrete efforts over the last
28 twelve years to significantly expand its business into mass retailers,

35

1  other than recent discussions with one potential licensing partner.

2  That is not sufficient to show a "'<u>strong</u> possibility of expansion

3  into competing markets.'"  <u>M2 Software</u>, 421 F.3d at 1085 (emphasis in

4  original); <u>Surfvivor</u>, 406 F.3d at 634 (finding speculation of

5  expansion insufficient to support likely confusion).  Therefore, this

6  factor has little impact on the likelihood of confusion.

7                    i.   <u>Summary of Sleekcraft Factors</u>

8       An overall evaluation of the <u>Sleekcraft</u> factors in this case

9  demonstrates that a factfinder would likely find a likelihood of

10  confusion here.  Seven of the eight factors, including the three most

11  important factors in the reverse confusion context, do not

12  significantly assist Chroma: the strength of the mark factor is

13  neutral; the relatedness of the goods and similarity of the marks

14  factors weigh only slightly in Chroma's favor; the overlapping

15  marketing channels factor weighs only slightly in favor of Chroma; the

16  expansion of product lines factor has little impact; and the degree of

17  customer care factor weighs against Chroma.  But the final factor —

18  actual confusion — supports finding likely confusion, given that

19  Boldface's products have only been on the market for a short time,

20  which is enough to tip the balance in Chroma's favor.

21            3.   <u>Scope of Chroma's Rights</u>

22       As part of the merits analysis of a common law trademark

23  infringement claim, a court must also consider the territorial scope

24  of the plaintiff's common law rights.  See <u>Glow</u>, 252 F. Supp. 2d at

25  983.  The scope of the plaintiff's rights is measured by "legally

26  sufficient market penetration," which is determined by looking at "the

27  trademark user's volume of sales and growth trends, the number of

28  persons buying the trademarked product in relation to the number of

potential purchasers, and the amount of advertising." <u>Id.</u> (citing, <u>inter alia</u>, <u>Adray v. Adry-Mart, Inc.</u>, 76 F.3d 984, 989 (9th Cir. 1996) and <u>Natural Footwear, Ltd. v. Hart, Schaffner & Marx</u>, 760 F.2d 1383, 1398—99 (3d Cir. 1985)).[21]

To establish trademark rights, market penetration must be more than de minimus, but it need not be overwhelming; it is enough to show "market penetration that is significant enough to pose the real likelihood of confusion among consumers in that area." <u>Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.</u>, 186 F.3d 311, 317 (3d Cir. 1999) (internal quotation marks omitted). In <u>Glow</u>, for example, the court held that the plaintiff had not established common law rights in <u>any</u> territory because it offered no specific evidence of sales volume or advertising in any location. <u>Glow</u>, 252 F. Supp. 2d at 985. Likewise, in <u>Lucent</u>, the court found insufficient market penetration in any market based on one sale of $323.50; the absence of evidence of growth trends; the "minute" ratio of existing and potential customers; the lack of advertising; and the small number of sales presentations. <u>Lucent</u>, 186 F.3d at 317.

Here, as the parties have framed the issue, the scope of

_____

[21]The Court agrees with the parties that the <u>Tea Rose—Rectanus</u> doctrine does not apply because this case does not involve two geographically remote users of a mark expanding into each other's territory. <u>See</u> 5 J. Thomas McCarthy, <u>McCarthy On Trademarks & Unfair Competition</u> § 26:1 (4th ed. 2012). However, the Court disagrees with Chroma's assertion that the "market penetration" test does not apply — that inquiry creates the territorial boundaries of Chroma's common law rights, as in this case, where the claimed senior user (Chroma) asserts common law rights against a junior user with rights stemming from a federal application for registration (Boldface). <u>See</u> <u>Lucent Info. Mgmt., Inc. v. Lucent Techs., Inc.</u>, 186 F.3d 311, 316 (3d Cir. 1999) (internal quotation marks omitted); <u>Allard Enters., Inc. v. Advanced Programming Resources, Inc.</u>, 249 F.3d 564, 573—75 (6th Cir. 2001).

Chroma's territorial rights is properly defined by three possible
areas: nationwide; Los Angeles County; or nowhere.  At oral argument,
the Court tentatively decided that, based on Chroma's evidence, none
of these formulations was correct, and that Chroma had shown that it
had established common law rights at most in only three zip codes in
Beverly Hills and one zip code in Encino, all of which surround
Chroma's two physical locations.  The Court permitted Chroma to submit
additional evidence that might support an expanded area of market
penetration.  Chroma submitted a list of customers divided by zip code
and argued for market penetration in all zip codes in Los Angeles
County in which it had more than six customers.  (Pl.'s Supp. Mem. 3;
Casino 2d Supp. Decl., Ex. 1.)  Upon review of the record, the Court
concludes that Chroma has not achieved nationwide or county-wide
market penetration, but that it has established common law rights in
the geographic areas surrounding Beverly Hills and Encino identified
below.

     Volume of Sales and Customers.  In assessing the volume of sales
and growth trends, the Court must look at each area individually.
Natural Footwear, 760 F.2d at 1399.  The Court must also consider the
price of the products because revenue from lower-priced products has
more significant market impact than the same revenue from higher-
priced goods.  See id. at 1399 n.35 ("Sales of $10,000 in a given area
are likely to represent more significant market penetration in that
area if the product is candy, than if the product is an automobile.").
Moreover, "the proper evaluation of market penetration should normally
include a comparison of the number of actual customers of the
trademarked product with the number of people in the market for the
product, rather than with the population of a given area."  Id. at

1399.

Chroma has submitted only generalized evidence of sales and customers.  Chroma's annual product sales were roughly 40% of its total sales, or $160,000 to $220,000 per year[22], but Chroma only segregates those numbers at the state level, and even then it only notes that 97.5% of those sales took place in California.  The average price of Chroma's products is $44 (Sobiesczyk Decl. ¶ 26), so Chroma has sold roughly between 3600 and 5000 units, almost exclusively in California.

As for customers, Chroma submits evidence that it serves approximately 1,000 customers per month at its retail locations (900 in Beverly Hills and 100 in Encino (Casino Supp. Decl. ¶ 3)), and although Chroma does not indicate what portion of those customers buy products, Chroma suggests that customers for services typically purchase products as well.  (Rey Reply Decl. ¶ 15.)  Moreover, Chroma has submitted its mailing lists, indicating that it has customers for its products in 44 states.  (Casino Supp. Decl., Ex. 3.)  Of those, 967, or 71.6%, are in California; the next closest is New York, with 76, and the other 42 states range from one to 24.  (Id. ¶ 7.)  Of the customers in California, 77.8%, or 754, are located in Los Angeles County, 72 in Orange County, 35 in Ventura County, 21 in San Diego County, and no more than 8 in other counties.  (Id. ¶ 7, Ex. 2.)  Using these proportions to calculate product sales in Los Angeles County, it appears that Chroma's sales in Los Angeles County may be roughly between $124,480 and $171,160, and between 2829 and 3890 units

---

[22]As noted previously, see supra n.5, Chroma presented inconsistent numbers in its supplemental brief and in Rey's Reply Declaration.  The Court accepts the numbers set forth in Rey's Reply Declaration.

1  (77.8% of California sales).[23]

2       Chroma has further segregated its mailing list by zip code,

3  providing the number of clients in each zip code area of Los Angeles

4  County to argue that it has achieved market penetration in at least

5  the areas in Los Angeles County in which it has six or more customers.

6  (Pl.'s Supp. Mem. 1—2.)  Chroma further notes that these numbers

7  underestimate its total customers by about 35% because Chroma does not

8  have address data for all its customers, although that assertion is

9  not supported by any evidence.  (Casino 2d Supp. Decl. ¶ 2.)

10 Moreover, Chroma does not identify what proportion of those clients

11 purchase services only, as opposed to products or both products and

12 services.

13      Despite these limitations, the Court has set forth in Appendix C

14 the zip codes in which Chroma claims six or more clients.  Using those

15 numbers as a proxy for sales, the Court has extrapolated the

16 proportion of sales in dollars and units per zip code.  The result is

17 that no one zip code area contains more than 10% of Chroma's clients;

18 for Brentwood, which has the highest number of clients at 71, the

19 proportionate sales volume is 9.42% of all sales in Los Angeles

20 County, or between $11,721.59 and $16,117.19, and between 266 and 366

21 units.  Every other zip contains a lesser proportion from 8.22%

22 (Pacific Palisades with 62 clients) to .80% (areas with 6 clients).

23      Boldface attacks Chroma's customer evidence by comparing the

24 number of customers in each zip code to the total population of that

25 zip code, which unsurprisingly results in very low proportions of

26

27      [23]Obviously the number of clients is not a perfect proxy for
product sales, given that only 71.6% of Chroma's clients are in
28 California but 97.5% of its sales occur here.

customers to population (between .01% and .34%).  (Fairfax Decl.,
Ex. 1.)  But in determining market penetration, the proper approach
is not to compare the number of customers to the total population in
a given area, but to compare the number of actual customers of
Chroma's products to the number of people in the market for that
product.  See Natural Footwear, 760 F.2d at 1399.

Chroma has not provided specific evidence of the number of
people in the market for its products in any area, whether
nationwide, in all of Los Angeles County, or in any area of Los
Angeles County.  The Court does not necessarily expect Chroma to
have that evidence at this early stage of the litigation.  The Court
generally agrees with Chroma that the market for high-end cosmetics
is probably relatively small, but that market could still be large
if considered nationwide or over a territory as large as Los Angeles
County.  In the areas surrounding the retail stores in Beverly Hills
and Encino, the market for high-end cosmetics is likely concentrated
and competitive, as shown by the existence of Chroma's four direct
competitors in Beverly Hills, suggesting that even in the localized
market of high-end cosmetics, Chroma's share of potential customers
may be limited.  (Casino Supp. Decl. ¶ 4.)[24]

_____

[24]As purely a hypothetical exercise, if the Court were to assume
that 10% of the population in any zip code area is the relevant
market, then Chroma's market penetration based on customers in any
single zip code area is less than 3%; if 5% of the population is the
relevant market, then Chroma's market penetration in any single area
is less than 7%; and if 1% of the population is the relevant market,
then Chroma's market penetration in some zip codes is as high as 34%.
(See Appendix D for a chart of these calculations.)  These
calculations, of course, are arbitrary, given that Chroma has offered
no evidence as to the actual size of the high-end cosmetics market.
They also probably understate Chroma's market share by about half
because the relevant market is likely comprised of almost all women,
(continued...)

1    The Court has also considered not only the numbers of Chroma's

2    customers in each zip code, but also the geographic distribution of

3    those customers, which reveals that Chroma's customers — and as a

4    result, Chroma's market recognition — are geographically

5    concentrated in the contiguous areas of Beverly Hills, Encino, Santa

6    Monica, Pacific Palisades, and the surrounding areas, identified by

7    the following zip codes: 90049; 90272; 90024; 90064; 90046; 90210;

8    90025; 90402; 90066; 90048; 90035; 90405; 90069; 90077; 90292;

9    90212; 90403; 90036; 91356; 91604; 91403; 91423; 91436; 90067;

10   91316; 90211; and 90292.[25]  As set forth in Appendix C, the Court

11   has calculated that over 93% of Chroma's total customers, and

12   extrapolated from that number, 93% of Chroma's total product sales,

13   are concentrated in these areas.  Given that the market is generally

14   relatively small and Chroma has a credible number of customers in

15   this contiguous area, this evidence supports market penetration in

16   these locations.

17       Growth Trends.  Chroma has also shown an inconsistent but

18   rising growth trend: from the years 2000 to 2007, Chroma's revenue

19   increased from $61,000 to over $550,000, then decreased by more than

20   $100,000 by 2009, and has begun increasing again through 2012,

21   albeit still not to its peak in 2007.  (Casino Supp. Decl., Ex. 1.)

22   But again, Chroma has not identified any growth trend specific to

23

24       [24](...continued)
     which would be roughly half of the total population in any given area.

25

26       [25]Chroma does not have more than six clients in four other small
     zip code areas that fall entirely within this geographic area: 90095
27   (0 clients), 90401 (3 clients), 90404 (4 clients), and 90291 (0
     clients).  Even so, Chroma's market penetration has likely reached
     into these areas, given that they are each completely surrounded by
28   other areas with concentrations of Chroma's clients.

Los Angeles County.  Without contextual evidence, the growth trends factor does not demonstrate market penetration in any particular area.

Advertising.  While Chroma's products and services have been featured in some national and local magazines, Chroma relies exclusively on word-of-mouth promotion.  Even assuming word-of-mouth promotion generally creates recognition among consumers, Chroma has only offered evidence that it has assisted in penetrating the market in the Los Angeles area.  (Rae Russell Supp. Decl. ¶ 3.) Importantly, Los Angeles County is comprised of 4,084 square miles with a population of more than ten million.  See www.lacounty.gov (Government tab, Geography tab, LAC Geography & Statistics Details tab).  There is no specific evidence that Chroma's word-of-mouth promotion has reached into areas as far north as Lancaster, as far south as Long Beach, or as far east as Pomona; the Court cannot conclude consumers in all areas of Los Angeles County have even been exposed to Chroma's products, let alone that they would likely be confused between Chroma's and Boldface's products.  Thus, word-of-mouth promotion might have helped create some localized market penetration surrounding Chroma's retail locations, but it does not demonstrate market penetration beyond those areas.

In sum, Chroma has shown a likelihood of establishing common law rights in Beverly Hills and Encino and the surrounding areas, including the following zip codes: 90049; 90272; 90024; 90064; 90046; 90210; 90025; 90402; 90066; 90048; 90035; 90405; 90069; 90077; 90292; 90212; 90403; 90036; 91356; 91604; 91403; 91423; 91436; 90067; 91316; 90211; and 90292; as well as in 90095, 90401, 90404, and 90291.

1          4.   Conclusion on the Merits

2          Under the circumstances, Chroma has demonstrated a likelihood

3     of prevailing on the merits: it will likely prevail on the issues of

4     validity and likelihood of confusion and that it has common law

5     trademark rights in Beverly Hills and Encino and the surrounding

6     areas as identified supra.

7     **B.   Likelihood of Irreparable Harm**

8          Chroma argues that irreparable harm may be presumed from its

9     showing of likelihood of success on its trademark infringement

10    claims.  That proposition is doubtful following the Supreme Court's

11    decisions in eBay inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)

12    and Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7

13    (2008).  Cf. Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.,

14    654 F.3d 989, 994—95 (9th Cir. 2011) (per curiam) (rejecting long-

15    standing rule presuming irreparable harm from a likelihood of

16    prevailing on the merits of a copyright infringement claim in light

17    of eBay and Winter).  But see Marlyn Nutraceuticals, Inc. v. Mucos

18    Pharma GmbH & Co., 571 F.3d 873, 877 (9th Cir. 2009) (accepting the

19    presumption of irreparable harm upon a showing of trademark

20    infringement without analysis).  The Court need not decide whether a

21    presumption of irreparable harm still exists in trademark cases

22    because Chroma has shown actual irreparable harm here.

23         Chroma has demonstrated that it has lost business and goodwill

24    due to Boldface's use of the KHROMA BEAUTY mark and that it is at

25    significant risk of being overwhelmed as Boldface rolls out the

26    KHROMA BEAUTY product line.  See Stuhlbarg Int'l Sales Co. v. John

27    D. Brush & Co., 240 F.3d 832, 841 (9th Cir. 2001) (finding loss of

28    customers and goodwill created irreparable harm).  As the Court

found above, customers are already confused and will likely continue to be confused as to whether Chroma's products are associated with Boldface's products; customers and employees are fearful that others might associate their use of Chroma's products with the Kardashians, which may result in loss of business to Chroma; and Chroma has lost some customer referrals from a prominent branding consultant due to the association between Chroma and the Kardashians.  There is a significant risk of likely irreparable harm to Chroma's reputation and goodwill.

### C.   Public Interest

The public interest favors a limited injunction to prevent likely confusion in the geographically limited areas outlined above. See Mattel, Inc. v. MCA Records, Inc., 296 F.3d 894, 905 (9th Cir. 2002).  This is a particularly true in this case because Chroma has presented evidence that confusion is already occurring, suggesting it will continue to occur absent an injunction.

### D.   Balance of Hardships

Even if Chroma has shown it will likely prevail on the merits of its claim, "an injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." Winter, 555 U.S. at 32.  Instead, "[a] preliminary injunction is an extraordinary remedy never awarded as of right" and the Court "'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  Id. at 24.  In trademark infringement cases, "a court must consider the impact granting or denying a motion for a preliminary injunction will have on the respective enterprises. Thus the relative size and strength of each enterprise may be

1  pertinent to this inquiry." <u>Int'l Jensen, Inc. v. Metrosound</u>

2  <u>U.S.A., Inc.</u>, 4 F.3d 819, 827 (9th Cir. 1993).

3      This case presents a unique challenge in assessing the harms at

4  stake: Chroma has demonstrated a likelihood that it will prove it

5  has a valid trademark that has been infringed, that it will be

6  irreparably harmed absent an injunction, and that the public

7  interest weighs in its favor, but all of those considerations are

8  limited by the fact that Chroma's rights only extend to a

9  circumscribed geographic area in metropolitan Los Angeles.  As a

10  result, any injunction must be tailored to protect those rights.

11  <u>See</u> <u>Stormans, Inc. v. Selecky</u>, 586 F.3d 1109, 1119 (9th Cir. 2009).

12  On the other hand, Boldface has offered substantial evidence that

13  enjoining infringement in the area in which Chroma has shown common

14  law rights will have a devastating impact on the nationwide roll-out

15  of the KHROMA BEAUTY products, far beyond the area in which Chroma

16  has common law trademark rights.  On balance, the equities strongly

17  tip against any injunction in this case.

18      Boldface offered evidence that it has already placed

19  substantial amounts of KHROMA BEAUTY products with national mass

20  retailers, and those retailers have already transmitted "planograms"

21  to their stores to ensure that each store's display has the same

22  look and feel.  (Ostoya Supp. Decl. ¶ 2.)  Yet, should even a

23  limited injunction issue, Boldface's factoring and inventory

24  financing partner has stated that it may continue to hold funds or

25  refuse to fund the inventory needed to fulfill Boldface's retail

26  orders, which is in the millions of dollars.  (Ostoya 2d Supp. Decl.

27  ¶ 10.)  QVC has indicated that it would likely not accept KHROMA

28  BEAUTY products at all if any injunction issues, depriving it of a

business opportunity worth millions of dollars.  (Id. ¶ 11.)  And
Boldface offers evidence that CVS, Ulta, and other retail partners,
will decline to distribute KHROMA BEAUTY products entirely if even a
limited injunction issues because those retailers would rather
cancel sales than risk a negative perception among their customers.
(Crames Decl. ¶ 7—10.)

Moreover, although at oral argument the Court suggested terms
for an injunction similar to the terms proposed by Chroma, upon
further briefing from the parties, it is clear that those terms are
unworkable.  For example, the Court proposed that Boldface include a
disclaimer on all nationwide printed material clarifying that Chroma
is not associated with Boldface.  The utility of that disclaimer for
dispelling confusion in the areas identified above would be
significantly discounted by the confusion it would engender in
significant parts of California and in the rest of the country,
where the public has never heard of Chroma or its products.
Furthermore, Boldface has pointed out that it would cancel its
national advertising at a significant cost, rather than include such
a disclaimer, which would provide, in its view, nationwide free
advertising for Chroma.  If it does cancel its advertising, Boldface
claims that it would breach agreements with retailers to undertake
national print advertising.  (Ostoya 2d Supp. Decl. ¶ 12.)  The
Court therefore will not order such a disclaimer, which would be a
mandatory injunction that is generally disfavored absent a showing
that "the facts and law clearly favor the moving party."  Stanley v.
Univ. of S. Cal., 13 F.3d 1313, 1320 (9th Cir. 1994) (internal
quotation marks omitted).

Similarly, the Court proposed enjoining internet sales from

47

retailers to customers in the areas surrounding Beverly Hills and Encino. However, Boldface offered evidence that implementing a system to segregate sales by zip code would be costly and that retailers would probably refuse to sell the KHROMA BEAUTY products through their websites, rather than implement the software necessary to block shipments to certain zip codes. (Id. ¶ 9.) Indeed, as pointed out by Robert Crames, the Chief Executive Officer of Horizon Beauty Group, LLC, which is assisting Boldface in the rollout of the KHROMA BEAUTY products, "there is no reason for Boldface's internet retail partners to incur any extra burden that may be associated with distributing the KHROMA BEAUTY products if they have to abide by the terms of an injunction and refrain from shipping to certain zip codes when they are selling many other SKUs of directly competitive products that do not carry the same burden." (Crames Decl. ¶ 9.)

Finally, the Court also proposed enjoining sales in retail stores, as well as advertising or marketing efforts, in the areas surrounding Beverly Hills and Encino. But without a disclaimer on national advertising or an injunction preventing internet sales, an injunction barring sales and advertising locally would do little to prevent consumer confusion, as local customers would still be exposed to the KHROMA BEAUTY products in national advertising and nearby stores, and be able to buy KHROMA BEAUTY products online.

Given that an injunction protecting Chroma's limited rights would have an unacceptable impact far beyond its intended scope, the equities in this case tip so strongly in Boldface's favor that no injunction is warranted.

**CONCLUSION**

Although Chroma has shown that three of the four preliminary injunction factors tip in its favor, Chroma's common law trademark rights are limited to areas surrounding Beverly Hills and Encino. As a result, the significant nationwide harm to Boldface from an injunction tips the balance of equities strongly against issuing an injunction.  Therefore, Chroma's motion is DENIED.

**DATED:**   1/23/13

**AUDREY B. COLLINS**

**UNITED STATES DISTRICT JUDGE**

APPENDIX A









APPENDIX B

APPENDIX C

| Zip Code | Number of Clients | Area | % of L.A. County Sales | Sales $ | Sales $ | Sales Units | Sales Units |
|---|---|---|---|---|---|---|---|
| 90049 | 71 | Brentwood | 9.42% | $11,721.59 | $16,117.19 | 266 | 366 |
| 90272 | 62 | Pacific Palisades | 8.22% | $10,235.76 | $14,074.16 | 233 | 320 |
| 90024 | 47 | Westwood | 6.23% | $7,759.36 | $10,669.12 | 176 | 242 |
| 90064 | 41 | Rancho Park/ Cheviot Hills | 5.44% | $6,768.81 | $9,307.11 | 154 | 212 |
| 90046 | 41 | West Hollywood | 5.44% | $6,768.81 | $9,307.11 | 154 | 212 |
| 90210 | 37 | Beverly Hills | 4.91% | $6,108.44 | $8,399.10 | 139 | 191 |
| 90025 | 37 | West LA | 4.91% | $6,108.44 | $8,399.10 | 139 | 191 |
| 90402 | 32 | Santa Monica | 4.24% | $5,282.97 | $7,264.08 | 120 | 165 |
| 90066 | 26 | Mar Vista | 3.45% | $4,292.41 | $5,902.07 | 98 | 134 |
| 90048 | 25 | Melrose/Beverly Center | 3.32% | $4,127.32 | $5,675.07 | 94 | 129 |
| 90035 | 25 | Beverlywood | 3.32% | $4,127.32 | $5,675.07 | 94 | 129 |
| 90405 | 24 | Santa Monica | 3.18% | $3,962.23 | $5,448.06 | 90 | 124 |
| 90069 | 23 | West Hollywood | 3.05% | $3,797.14 | $5,221.06 | 86 | 119 |
| 90077 | 23 | Bel Air | 3.05% | $3,797.14 | $5,221.06 | 86 | 119 |
| 90292 | 22 | Marina Del Rey | 2.92% | $3,632.04 | $4,994.06 | 83 | 114 |
| 90212 | 20 | Beverly Hills | 2.65% | $3,301.86 | $4,540.05 | 75 | 103 |
| 90403 | 20 | Santa Monica | 2.65% | $3,301.86 | $4,540.05 | 75 | 103 |
| 90036 | 19 | Miracle Mile/ La Brea | 2.52% | $3,136.76 | $4,313.05 | 71 | 98 |
| 90266 | 18 | Manhattan Beach | 2.39% | $2,971.67 | $4,086.05 | 68 | 93 |
| 91356 | 18 | Tarzana | 2.39% | $2,971.67 | $4,086.05 | 68 | 93 |
| 91604 | 16 | Studio City | 2.12% | $2,641.49 | $3,632.04 | 60 | 83 |
| 91302 | 15 | Calabasas | 1.99% | $2,476.39 | $3,405.04 | 56 | 77 |
| 91403 | 15 | Sherman Oaks | 1.99% | $2,476.39 | $3,405.04 | 56 | 77 |
| 90265 | 14 | Malibu | 1.86% | $2,311.30 | $3,178.04 | 53 | 72 |
| 90254 | 13 | Hermosa Beach | 1.72% | $2,146.21 | $2,951.03 | 49 | 67 |
| 91423 | 13 | Sherman Oaks | 1.72% | $2,146.21 | $2,951.03 | 49 | 67 |
| 91436 | 13 | Encino | 1.72% | $2,146.21 | $2,951.03 | 49 | 67 |
| 90067 | 12 | Century City | 1.59% | $1,981.11 | $2,724.03 | 45 | 62 |
| 90068 | 12 | Hollywood | 1.59% | $1,981.11 | $2,724.03 | 45 | 62 |
| 90004 | 11 | Hancock Park | 1.46% | $1,816.02 | $2,497.03 | 41 | 57 |
| 90007 | 11 | USC | 1.46% | $1,816.02 | $2,497.03 | 41 | 57 |
| 91367 | 10 | Woodland Hills | 1.33% | $1,650.93 | $2,270.03 | 38 | 52 |
| 90034 | 9 | Palms | 1.19% | $1,485.84 | $2,043.02 | 34 | 46 |
| 91316 | 9 | Encino | 1.19% | $1,485.84 | $2,043.02 | 34 | 46 |
| 90019 | 8 | Mid City | 1.06% | $1,320.74 | $1,816.02 | 30 | 41 |

Court's Proposed Injunction Area (bolded zip codes)

| | | |
|---|---|---|
| Sales $ | $116,060.27 | 93.24% |
| Sales $ | $159,582.86 | 93.24% |
| Sales Units | 2,638 | 93.24% |
| Sales Units | 3,627 | 93.24% |
| Customers | 703 | 93.24% |

APPENDIX C

| Zip Code | Number of Clients | Area | % of L.A. County Sales | Sales $ | | Sales Units | |
|---|---|---|---|---|---|---|---|
| 90274 | 8 | Palos Verdes | 1.06% | $1,320.74 | $1,816.02 | 30 | 41 |
| 91362 | 8 | Thousand Oaks | 1.06% | $1,320.74 | $1,816.02 | 30 | 41 |
| 91364 | 8 | Woodland Hills | 1.06% | $1,320.74 | $1,816.02 | 30 | 41 |
| 90232 | 7 | Culver City | 0.93% | $1,155.65 | $1,589.02 | 26 | 36 |
| 90045 | 7 | Westchester | 0.93% | $1,155.65 | $1,589.02 | 26 | 36 |
| 90277 | 7 | Redondo Beach | 0.93% | $1,155.65 | $1,589.02 | 26 | 36 |
| 90026 | 6 | Silverlake | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| 90027 | 6 | Griffith Park | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| **90211** | 6 | Beverly Hills | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| 90230 | 6 | Culver City | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| **90292** | 6 | Venice | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| 91301 | 6 | Agoura | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| 91326 | 6 | Northridge | 0.80% | $990.56 | $1,362.02 | 23 | 31 |
| 92037 | 6 | La Jolla | 0.80% | $990.56 | $1,362.02 | 23 | 31 |

APPENDIX D

| Zip Code | Number of Clients | Area | L.A. County Population | 10% Market Assumption | 5% Market Assumption | 1% Market Assumption | % of Market (10%) | % of Market (5%) | % of Market (1%) |
|---|---|---|---|---|---|---|---|---|---|
| 90049 | 71 | Brentwood | 37,906 | 3,791 | 1,895 | 379 | 1.87% | 3.75% | 18.73% |
| 90272 | 62 | Pacific Palisades | 19,745 | 1,975 | 987 | 197 | 2.38% | 6.28% | 31.40% |
| 90024 | 47 | Westwood | 43,300 | 4,330 | 2,165 | 433 | 0.95% | 2.17% | 10.85% |
| 90064 | 41 | Rancho Park/ Cheviot Hills | 31,613 | 3,161 | 1,581 | 316 | 1.30% | 2.59% | 12.97% |
| 90046 | 41 | West Hollywood | 48,792 | 4,879 | 2,440 | 488 | 0.76% | 1.68% | 8.40% |
| 90210 | 37 | Beverly Hills | 24,465 | 2,447 | 1,223 | 245 | 1.51% | 3.02% | 15.12% |
| 90025 | 37 | West LA | 45,338 | 4,534 | 2,267 | 453 | 0.71% | 1.63% | 8.16% |
| 90402 | 32 | Santa Monica | 9,458 | 946 | 473 | 95 | 2.75% | 6.77% | 33.83% |
| 90066 | 26 | Mar Vista | 54,233 | 5,423 | 2,712 | 542 | 0.46% | 0.96% | 4.79% |
| 90048 | 25 | Melrose/Beverly Center | 22,084 | 2,208 | 1,104 | 221 | 1.13% | 2.26% | 11.32% |
| 90035 | 25 | Beverlywood | 28,930 | 2,893 | 1,447 | 289 | 0.83% | 1.73% | 8.64% |
| 90405 | 24 | Santa Monica | 24,942 | 2,494 | 1,247 | 249 | 0.92% | 1.92% | 9.62% |
| 90069 | 23 | West Hollywood | 21,101 | 2,110 | 1,055 | 211 | 1.09% | 2.18% | 10.90% |
| 90077 | 23 | Bel Air | 11,308 | 1,131 | 565 | 113 | 1.95% | 4.07% | 20.34% |
| 90292 | 22 | Marina Del Rey | 19,790 | 1,979 | 990 | 198 | 1.01% | 2.22% | 11.12% |
| 90212 | 20 | Beverly Hills | 11,902 | 1,190 | 595 | 119 | 1.68% | 3.36% | 16.80% |
| 90403 | 20 | Santa Monica | 23,084 | 2,308 | 1,154 | 231 | 0.82% | 1.73% | 8.66% |
| 90036 | 19 | Miracle Mile/ La Brea | 35,551 | 3,555 | 1,778 | 356 | 0.51% | 1.07% | 5.34% |
| 90266 | 18 | Manhattan Beach | 34,651 | 3,465 | 1,733 | 347 | 0.52% | 1.04% | 5.19% |
| 91356 | 18 | Tarzana | 28,236 | 2,824 | 1,412 | 282 | 0.57% | 1.27% | 6.37% |
| 91604 | 16 | Studio City | 28,041 | 2,804 | 1,402 | 280 | 0.53% | 1.14% | 5.71% |
| 91302 | 15 | Calabasas | 25,153 | 2,515 | 1,258 | 252 | 0.60% | 1.19% | 5.96% |
| 91403 | 15 | Sherman Oaks | 22,610 | 2,261 | 1,131 | 226 | 0.62% | 1.33% | 6.63% |
| 90265 | 14 | Malibu | 12,970 | 1,297 | 649 | 130 | 1.00% | 2.16% | 10.79% |
| 90254 | 13 | Hermosa Beach | 19,045 | 1,905 | 952 | 190 | 0.68% | 1.37% | 6.83% |
| 91423 | 13 | Sherman Oaks | 31,009 | 3,101 | 1,550 | 310 | 0.42% | 0.84% | 4.19% |
| 91436 | 13 | Encino | 14,507 | 1,451 | 725 | 145 | 0.83% | 1.79% | 8.96% |
| 90067 | 12 | Century City | 3,505 | 351 | 175 | 35 | 3.42% | 6.85% | 34.24% |
| 90068 | 12 | Hollywood | 28,777 | 2,878 | 1,439 | 288 | 0.38% | 0.83% | 4.17% |
| 90004 | 11 | Hancock Park | 65,103 | 6,510 | 3,255 | 651 | 0.17% | 0.34% | 1.69% |
| 90007 | 11 | USC | 54,908 | 5,491 | 2,745 | 549 | 0.18% | 0.40% | 2.00% |
| 91367 | 10 | Woodland Hills | 36,370 | 3,637 | 1,819 | 364 | 0.25% | 0.55% | 2.75% |
| 90034 | 9 | Palms | 58,639 | 5,864 | 2,932 | 586 | 0.15% | 0.31% | 1.53% |
| 91316 | 9 | Encino | 22,423 | 2,242 | 1,121 | 224 | 0.36% | 0.80% | 4.01% |

APPENDIX D

| Zip Code | Number of Clients | Area | L.A. County Population | 10% Market Assumption | 5% Market Assumption | 1% Market Assumption | % of Market (10%) | % of Market (5%) | % of Market (1%) |
|---|---|---|---|---|---|---|---|---|---|
| 90019 | 8 | Mid City | 65,171 | 6,517 | 3,259 | 652 | 0.12% | 0.25% | 1.23% |
| 90274 | 8 | Palos Verdes | 19,745 | 1,975 | 987 | 197 | 0.41% | 0.81% | 4.05% |
| 91362 | 8 | Thousand Oaks | 35,838 | 3,584 | 1,792 | 358 | 0.22% | 0.45% | 2.23% |
| 91364 | 8 | Woodland Hills | 26,049 | 2,605 | 1,302 | 260 | 0.27% | 0.61% | 3.07% |
| 90232 | 7 | Culver City | 16,655 | 1,666 | 833 | 167 | 0.42% | 0.84% | 4.20% |
| 90045 | 7 | Westchester | 43,542 | 4,354 | 2,177 | 435 | 0.16% | 0.32% | 1.61% |
| 90277 | 7 | Redondo Beach | 29,203 | 2,920 | 1,460 | 292 | 0.21% | 0.48% | 2.40% |
| 90026 | 6 | Silverlake | 68,101 | 6,810 | 3,405 | 681 | 0.09% | 0.18% | 0.88% |
| 90027 | 6 | Griffith Park | 122,734 | 12,273 | 6,137 | 1,227 | 0.05% | 0.10% | 0.49% |
| **90211** | 6 | Beverly Hills | 9,317 | 932 | 466 | 93 | 0.64% | 1.29% | 6.44% |
| 90230 | 6 | Culver City | 32,928 | 3,293 | 1,646 | 329 | 0.18% | 0.36% | 1.82% |
| **90292** | 6 | Venice | 19,790 | 1,979 | 990 | 198 | 0.30% | 0.61% | 3.03% |
| 91301 | 6 | Agoura | 27,990 | 2,799 | 1,400 | 280 | 0.21% | 0.43% | 2.14% |
| 91326 | 6 | Northridge | 27,241 | 2,724 | 1,362 | 272 | 0.22% | 0.44% | 2.20% |
| 92037 | 6 | La Jolla | 45,465 | 4,547 | 2,273 | 455 | 0.00% | 0.26% | 1.32% |

| Court's Proposed Injunction Area (bolded zip codes) | | |
|---|---|---|
| % of Market (10%) | % of Market (5%) | % of Market (1%) |
| 1.01% | 2.03% | 10.14% |

APPENDIX D

| Zip Code | Number of Clients | Area | 50% Women | 10% Market Assumption | 5% Market Assumption | 1% Market Assumption | % of Market (10%) | % of Market (5%) | % of Market (1%) |
|---|---|---|---|---|---|---|---|---|---|
| 90049 | 71 | Brentwood | 18,953 | 1,895 | 948 | 190 | 3.75% | 7.49% | 37.46% |
| 90272 | 62 | Pacific Palisades | 9,873 | 987 | 494 | 99 | 6.28% | 12.56% | 62.80% |
| 90024 | 47 | Westwood | 21,650 | 2,165 | 1,083 | 217 | 2.17% | 4.34% | 21.71% |
| 90064 | 41 | Rancho Park/ Cheviot Hills | 15,807 | 1,581 | 790 | 158 | 2.59% | 5.19% | 25.94% |
| 90046 | 41 | West Hollywood | 24,396 | 2,440 | 1,220 | 244 | 1.68% | 3.36% | 16.81% |
| 90210 | 37 | Beverly Hills | 12,233 | 1,223 | 612 | 122 | 3.02% | 6.05% | 30.25% |
| 90025 | 37 | West LA | 22,669 | 2,267 | 1,133 | 227 | 1.63% | 3.26% | 16.32% |
| 90402 | 32 | Santa Monica | 4,729 | 473 | 236 | 47 | 6.77% | 13.53% | 67.67% |
| 90066 | 26 | Mar Vista | 27,117 | 2,712 | 1,356 | 271 | 0.96% | 1.92% | 9.59% |
| 90048 | 25 | Melrose/Beverly Center | 11,042 | 1,104 | 552 | 110 | 2.26% | 4.53% | 22.64% |
| 90035 | 25 | Beverlywood | 14,465 | 1,447 | 723 | 145 | 1.73% | 3.46% | 17.28% |
| 90405 | 24 | Santa Monica | 12,471 | 1,247 | 624 | 125 | 1.92% | 3.85% | 19.24% |
| 90069 | 23 | West Hollywood | 10,551 | 1,055 | 528 | 106 | 2.18% | 4.36% | 21.80% |
| 90077 | 23 | Bel Air | 5,654 | 565 | 283 | 57 | 4.07% | 8.14% | 40.68% |
| 90292 | 22 | Marina Del Rey | 9,895 | 990 | 495 | 99 | 2.22% | 4.45% | 22.23% |
| 90212 | 20 | Beverly Hills | 5,951 | 595 | 298 | 60 | 3.36% | 6.72% | 33.61% |
| 90403 | 20 | Santa Monica | 11,542 | 1,154 | 577 | 115 | 1.73% | 3.47% | 17.33% |
| 90036 | 19 | Miracle Mile/ La Brea | 17,776 | 1,778 | 889 | 178 | 1.07% | 2.14% | 10.69% |
| 90266 | 18 | Manhattan Beach | 17,326 | 1,733 | 866 | 173 | 1.04% | 2.08% | 10.39% |
| 91356 | 18 | Tarzana | 14,118 | 1,412 | 706 | 141 | 1.27% | 2.55% | 12.75% |
| 91604 | 16 | Studio City | 14,021 | 1,402 | 701 | 140 | 1.14% | 2.28% | 11.41% |
| 91302 | 15 | Calabasas | 12,577 | 1,258 | 629 | 126 | 1.19% | 2.39% | 11.93% |
| 91403 | 15 | Sherman Oaks | 11,305 | 1,131 | 565 | 113 | 1.33% | 2.65% | 13.27% |
| 90265 | 14 | Malibu | 6,485 | 649 | 324 | 65 | 2.16% | 4.32% | 21.59% |
| 90254 | 13 | Hermosa Beach | 9,523 | 952 | 476 | 95 | 1.37% | 2.73% | 13.65% |
| 91423 | 13 | Sherman Oaks | 15,505 | 1,550 | 775 | 155 | 0.84% | 1.68% | 8.38% |
| 91436 | 13 | Encino | 7,254 | 725 | 363 | 73 | 1.79% | 3.58% | 17.92% |
| 90067 | 12 | Century City | 1,753 | 175 | 88 | 18 | 6.85% | 13.69% | 68.47% |
| 90068 | 12 | Hollywood | 14,389 | 1,439 | 719 | 144 | 0.83% | 1.67% | 8.34% |
| 90004 | 11 | Hancock Park | 32,552 | 3,255 | 1,628 | 326 | 0.34% | 0.68% | 3.38% |
| 90007 | 11 | USC | 27,454 | 2,745 | 1,373 | 275 | 0.40% | 0.80% | 4.01% |
| 91367 | 10 | Woodland Hills | 18,185 | 1,819 | 909 | 182 | 0.55% | 1.10% | 5.50% |
| 90034 | 9 | Palms | 29,320 | 2,932 | 1,466 | 293 | 0.31% | 0.61% | 3.07% |
| 91316 | 9 | Encino | 11,212 | 1,121 | 561 | 112 | 0.80% | 1.61% | 8.03% |

APPENDIX D

| Zip Code | Number of Clients | Area | 50% Women | 10% Market Assumption | 5% Market Assumption | 1% Market Assumption | % of Market (10%) | % of Market (5%) | % of Market (1%) |
|---|---|---|---|---|---|---|---|---|---|
| 90019 | 8 | Mid City | 32,586 | 3,259 | 1,629 | 326 | 0.25% | 0.49% | 2.46% |
| 90274 | 8 | Palos Verdes | 9,873 | 987 | 494 | 99 | 0.81% | 1.62% | 8.10% |
| 91362 | 8 | Thousand Oaks | 17,919 | 1,792 | 896 | 179 | 0.45% | 0.89% | 4.46% |
| 91364 | 8 | Woodland Hills | 13,025 | 1,302 | 651 | 130 | 0.61% | 1.23% | 6.14% |
| 90232 | 7 | Culver City | 8,328 | 833 | 416 | 83 | 0.84% | 1.68% | 8.41% |
| 90045 | 7 | Westchester | 21,771 | 2,177 | 1,089 | 218 | 0.32% | 0.64% | 3.22% |
| 90277 | 7 | Redondo Beach | 14,602 | 1,460 | 730 | 146 | 0.48% | 0.96% | 4.79% |
| 90026 | 6 | Silverlake | 34,051 | 3,405 | 1,703 | 341 | 0.18% | 0.35% | 1.76% |
| 90027 | 6 | Griffith Park | 61,367 | 6,137 | 3,068 | 614 | 0.10% | 0.20% | 0.98% |
| **90211** | 6 | Beverly Hills | 4,659 | 466 | 233 | 47 | 1.29% | 2.58% | 12.88% |
| 90230 | 6 | Culver City | 16,464 | 1,646 | 823 | 165 | 0.36% | 0.73% | 3.64% |
| **90292** | 6 | Venice | 9,895 | 990 | 495 | 99 | 0.61% | 1.21% | 6.06% |
| 91301 | 6 | Agoura | 13,995 | 1,400 | 700 | 140 | 0.43% | 0.86% | 4.29% |
| 91326 | 6 | Northridge | 13,621 | 1,362 | 681 | 136 | 0.44% | 0.88% | 4.41% |
| 92037 | 6 | La Jolla | 22,733 | 2,273 | 1,137 | 227 | 0.26% | 0.53% | 2.64% |
| | | | | | | | | | |
| | | | Court's Proposed Injunction Area (bolded zip codes) | | | | | | |
| | | | % of Market (10%) | % of Market (5%) | % of Market (1%) | | | | |
| | | | 2.03% | 4.06% | 20.29% | | | | |